**MUNICIPAL LIGHT BOARDS OF READ-ING AND WAKEFIELD MASSA-CHUSETTS, Petitioners,**

v.

**FEDERAL POWER COMMISSION, Respondent,**

**Boston Edison Company, Intervenor.**

**No. 24450.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 21, 1971.

Decided Oct. 14, 1971.

---

**1344**

Mr. George Spiegel, Washington, D. C., with whom Mr. James F. Fairman, Jr., Washington, D. C., was on the brief, for petitioners.

Mr. Peter H. Schiff, Solicitor, Federal Power Commission at the time of oral argument, with whom Messrs. Gordon Gooch, General Counsel, Leonard D. Eesley, Asst. General Counsel, Miss Sandra J. Strebel and David F. Stover, Attys., Federal Power Commission, were on the brief, for respondent.

Mr. Thomas M. Debevoise, Washington, D. C., with whom Mr. George F. Bruder, Washington, D. C., was on the brief, for intervenor.

Mr. Richard A. Solomon, Washington, D. C., filed a brief on behalf of Boston Gas Company as amicus curiae.

Mr. Charles F. Wheatley, Jr., and Mrs. Grace Powers Monaco, Washington, D. C., filed a brief on behalf of the Towns of Concord, Norwood and Wellesley, Massachusetts, as amici curiae.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and LEVENTHAL, Circuit Judge.

LEVENTHAL, Circuit Judge:

This case involves a challenge to the preliminary treatment accorded by the Federal Power Commission to a rate increase filing by Boston Edison Company ("Edison"). The petition to review the Commission's order has been filed by the Municipal Light Boards of Reading and Wakefield, Massachusetts ("Towns"), which own and operate municipal electrical distribution systems and purchase their total power supply from Edison, their wholesale supplier.

## I. FACTS AND PRIOR HISTORY

On January 29, 1970, Boston Edison submitted for filing to the FPC a rate schedule, intended to supersede the company's existing rate schedule, which proposed an increase of rates, yielding an addition of some $2.7 million annually, and also making changes in the terms of service.

On February 24, 1970, the Towns filed a motion to reject the Edison filing contending (a) that it contained provisions in the terms of service prima facie contrary to national antitrust policy, and (b) that the filing failed to provide the required functional classifications both as to accumulated depreciation and current depreciation expense. Two days later the Towns sent a letter to the FPC which referred to its contentions and added other alleged deficiencies in the filing, and which urged that if the rate filing were not rejected it be suspended for the maximum five month period permitted by the Federal Power Act and made the subject of an investigation and hearing.

On April 22, 1970, following Edison's answer to the motion to reject, the Towns filed another motion to reject the filing on the ground that Edison was failing to provide a utility grade of service.[1]

On April 29, 1970, the FPC issued an order which denied the Towns' motions to reject, suspended the Edison filing

---

1. This alleged frequent and substantial system-wide voltage reductions and Edison's warnings of anticipated service interruption and limitations during the peak summer months.

for one day after which it was to go into effect subject to refund, and set the various issues presented for a hearing. Commissioner Carver dissented from the decision to suspend the filing for only one day.

On May 8, 1970, the Towns filed a Motion for Emergency Amendment of Order requesting an interim postponement of the effective date of rate increase in order to give them time, under local law, to properly redesignate their retail rates so as to pass on the increases to their retail consumers. Boston Gas Co., another wholesale customer of Edison, intervened on May 12, 1970, and moved for an emergency amendment of the April 29 order on the ground that the FPC's Rules require that a utility complete its documentary submission 60 days before the changed rate becomes effective and that the FPC had found in its April 29 Order that Edison had not completed its filing until March 30, 1970. On May 26, 1970, the FPC denied the motions.

The Towns' application for rehearing was denied by order of June 26, 1970. A separate order issued the same day required consideration in the rate proceeding of the service inadequacies alleged by the Towns and their effect on the proper rate for the service rendered.

## II. ISSUES RELATING TO REJECTION OF RATE INCREASE FILING

The Towns' claim that the changed terms of service violated national antitrust policy has been mooted.[2] The issue before us is whether the FPC was required to reject the filing because of alleged (a) inadequacies of Edison's prior service, a contention that has generated a dispute as to facts as well as standards, and (b) failure to comply with rules requiring functional classification for accumulated depreciation and depreciation expense, a claim that will be considered further in due course.

We begin our consideration with some general reflections concerning the significance in administrative law terms of an agency's "rejection" of a filing. The FPC's regulations under the Federal Power Act provide that the Commission's Secretary shall reject any filing "which patently fails to substantially comply" with applicable requirements of the Commission's regulations and rules of practice.[3]

■ There is a sound use, and indeed requirement, of an agency "rejection" of a party's filing. But it should mark the clear case of a filing that patently is either deficient in form or a substantive nullity.

■ The general thrust of the Administrative Procedure Act is the requirement of a proceeding for the presentation of conflicting contentions for resolution by the agency.[4] There are occasions when an agency may dispose of a controversy on the pleadings without an evidentiary hearing when the opposing presentations reveal that no dispute of fact is involved, but only a question of law or administrative policy of such a nature that there is neither a dispute as to material facts nor a need to ventilate the underlying facts to aid in policy determination. Citizens for Allegan Coun-

---

2. Counsel for the Towns filed a memorandum on June 8, 1971, in response to our request at oral argument, advising that this issue was mooted by a settlement reached by the parties to this proceeding which was entered into the record (Federal Power Commission, Docket E–7400 et al.) at hearing on March 16, 1971, and approved by Order of the FPC issued June 2, 1971.

3. 18 C.F.R. § 35.5:
 "The Secretary, pursuant to the Commission's rules of practice and procedure and delegation of Commission authority, shall reject any material submitted for filing with the Commission which patently fails to substantially comply with the applicable requirements set forth in this part, or the Commission's rules of practice and procedure."

4. Sections 4 and 5, 5 U.S.C. §§ 553, 554 (Supp. V, 1970).

ty, Inc. v. F.P.C., 134 U.S.App.D.C. 229, 414 F.2d 1125 (1969). These matters present to the agency a procedure that may readily be likened to the motion for summary judgment contemplated by Rule 56 of the Federal Rules of Civil Procedure.

A "rejection" of a filing, in contrast, is more like a motion to dismiss on the face of the pleading, and indeed goes even beyond that. It is appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest.

It is "a peremptory form of response to filed tariffs" which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order.[5] Its use is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket. The pertinent considerations may go beyond mere administrative choice in docketing techniques, as appears from the statutes governing rate filings, where a filing once lodged is permitted to go into effect, either at once, if not suspended, or at any rate after a suspension period subject to a time limit. In these situations a rate filing may be rejected both when the governing statute explicitly provides for rejection [6] and when it does not. The Commission had the authority to issue a regulation like 18 C.F.R. § 35.5 (supra note 3) for the rejection of filings that patently fail to establish substantial compliance with duly issued regulations.

This rests on its basic statutory authority to issue regulations "necessary or appropriate to carry out the provisions of the Act." [7] This authority is "not restricted to procedural minutiae" and provides latitude for administration in furtherance of Congressional purposes,[8] including this "rejection" regulation. Thus in Federal Power Commission v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964), the Court upheld the rejection without hearing of an application for a certificate of convenience and necessity to supply gas to a pipeline, when the application was supported by a contract containing an "indefinite escalation" pricing clause and outstanding regulations provided that such clauses would result in summary rejection. The Court upheld the summary rejection as avoiding a "vast proliferation of hearings." [9]

In United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) the Court held that the FPC erred in failing to exercise its authority to reject a rate filing that was a nullity, because the natural gas company had sought unilaterally to change a rate set by contract, and in issuing an order "permitting" the new rates to become effective.

---

5. F. Welch, Cases and Text on Public Utility Regulation 581 (1961). "A 'notice of rejection' is not generally used to dispose of a case on its merits. It is more in the nature of a procedural or interim pleading or response, giving the utility an opportunity to correct some defect in its original filings, or to file new schedules or tariffs in proper order, if it so desires." Id.

6. W. J. Dillner Transfer Co. v. United States and ICC, 214 F.Supp. 941 (W.D. Pa., 3-judge court, 1963) (tariff named rates for interstate transportation of certain commodities for which the motor carrier held no operating authority).

7. Section 309 of the Federal Power Act, 16 U.S.C. § 825h (1964).

8. Niagara Mohawk Power Corp. v. F.P.C., 126 U.S.App.D.C. 376, 383, 379 F.2d 153, 160 (1967).

9. While the Court also referred to the application as "not in proper form" (377 U.S. at 45, 84 S.Ct. 1105, 12 L.Ed.2d 112), obviously form and substance were interrelated, and even an application that admittedly is filed "in proper form and manner" may be rejected if its content reveals that it is plainly a nullity. See Dillner v. United States, supra note 6, 214 F.Supp. at 944.

These Supreme Court precedents under the Natural Gas Act are plainly applicable to the Federal Power Act, involved in the case at bar.[10] And in the context of their doctrines we take up the issues presented by petitioners.

### 1. Issue of Objections to Quality of Service

Neither the Commission's regulations nor general principles required rejection of Edison's rate filing on the basis of objections to Edison's prior service. Edison disputed as a factual matter the number and duration of voltage reductions set forth in the Towns' motion and claimed that some of the reductions were not due to problems in its own system but were area-wide in nature. The June 26, 1970, order granted the Towns' motion of April 22 insofar as it requested "an investigation into whether the quality and adequacy of electrical service rendered by Edison to its wholesale customers may affect the lawful rates to be charged for such service," pursuant to the FPC's finding that "It is appropriate that we consider in this proceeding whether interstate rates should be adjusted to reflect these specific alleged service inadequacies to the extent that they relate to Edison's system." The Commission acted properly in providing for a hearing on the issues raised by the Towns' factual allegations. What Edison's filing presents is not a patent nullity but at most a matter that may be resolved against it, in whole or in part, after a hearing and determination of the controverted issues of fact, policy and law.

### 2. Issue of Lack of Compliance with Regulations Requiring Functional Classification of Accumulated Depreciation and Depreciation Expense

The Regulation concerning "Filing of Changes in Rate Schedule," 18 C.F.R. § 35.13, lists fifteen detailed statements that must be submitted with a rate filing, of which two relate to depreciation:

### Statement E—Accumulated Depreciation.

A statement of the accumulated provision for depreciation by functional classification as of the beginning and the end of the test period.

\* \* \* \* \* \*

### Statement I—Depreciation Expense.

For the test period show depreciation expense by functional classification. The annual rates used in computing such expense and the method of determining such depreciation rates should also be shown.[11]

"Functional classification" is defined as "classification as among production, transmission, distribution, and general functions."[12]

Edison's filing did not show accumulated depreciation provisions and depreciation expenses by functional classification. Its Statements E and I contain only one figure, with a note that the figure shown is "[a]pplicable to all depreciable property, no breakdown between various kinds of property has been made on the books of the Company." (R. 753, 765) Nor does Statement I explain the method of determining depreciation rates; the Statement merely sets forth the annual rate used in determining the expense and says, "Such amounts are believed by the management, based on past experience, to be sufficient to meet write-offs of the cost of property at the end of its useful life."

The Towns assert that these failures to functionalize the depreciation accounts require reversal of the Commission's decision not to reject the filing. We disagree.

Insofar as the issue of rejection *vel non* is concerned, the purpose of the depreciation accounting provisions in § 35.5 of the regulations is to assure that the rate filing will provide the FPC with the

---

10. United Gas Pipe Line Co. v. Mobile Gas Service Corp., *supra*, 350 U.S. at 346–347, 76 S.Ct. 373, 100 L.Ed. 373.

11. 18 C.F.R. § 35.13(b) (4) (iv), Statements *E* and *I*.

12. *Id.* at Statement *D*, n. 2.

necessary information from which it can reach an informed and equitable decision as to the necessity for an investigation, hearing, and suspension, and to permit the Commission and parties in interest with meaningful opportunity to prepare for any proceeding.

■ These filing rules are different from the regular depreciation rules mandated by the FPC's Uniform System of Accounts. The Uniform System of Accounts is an exercise of the FPC's power under the Act to require public utilities to keep accounts, including depreciation accounts, in accordance with such rules and regulations as necessary or appropriate for purposes of administration of the Act. *See* Appalachian Power Co. v. FPC, 328 F.2d 237, 246–249 (4th Cir. 1964), cert. denied, 379 U.S. 829, 85 S.Ct. 59, 13 L.Ed.2d 38 (1964); A. T. & T. Co. v. United States, 299 U.S. 232, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

■ ■ The filing rules at issue here are designed to give the FPC a "first cut" at the material in the filing. They are "mere aids to the exercise of the agency's independent discretion," and in both language and purpose leave room for a doctrine of "substantial" or "reasonable" compliance. American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). We cannot say that the FPC was unreasonable in finding the filing sufficiently complete for it to be able to decide whether or not to investigate and suspend the increased rate.[13]

This conclusion is not undercut by the possibility, or indeed probability, that during the investigation and hearing on Edison's filing there will emerge more refined functionalized depreciation figures that differ from the rough amounts derivable for initial purposes from the filing itself.[14] As to the present issue, we think the FPC cannot be held to be unreasonable in its failure to reject the entire filing ab initio, even though the utility did not comply rigorously with the letter of the filing regulations.

## III. REVIEWABILITY OF ONE-DAY SUSPENSION OF FILING

■ ■ The Federal Power Act provides that any rate or charge made, demanded or received by any public utility for electric energy "that is not just and reasonable is hereby declared to be unlawful."[15] Its primary aim is the protection of consumers from excessive rates and charges. *See* Atlantic Refining Co. v. Public Service Comm'n, 360 U.S. 378, 388–389, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); FPC v. Hope Natural Gas Co., 320 U.S. 591, 610–612, 64 S.Ct. 281, 88 L.Ed. 333 (1944). To effectuate this purpose, the FPC is empowered, either upon complaint or on its own initiative, to enter upon an investigation concerning the lawfulness of a rate in a newly filed schedule.[16] Section 205(e), 16 U.S.C. 824d(e) further provides a suspension authority:

> [P]ending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering

---

13. The FPC brief maintains that functionalized depreciation reserves can be computed readily for these purposes by applying to the total depreciation reserves set out in Edison's filing the percentages applicable to the comparable functions of depreciable plant set out as required in Statement D (R. 751–52). To each function of depreciable plant thus derived, functionalized depreciation expense can be calculated by applying 3%, the rate used by Edison in its own depreciation calculations. (Statement I, R. 765; see also the amounts allocated to depreciation in Statement M, "Allocated Costs of Service", R. 782).

14. As a result of an earlier compliance audit by the FPC accounting staff, Edison in 1968 engaged an economic consulting firm to conduct a complete analysis of its plant in order to establish separate depreciation accounts for the basic functional classes of plant. This study was completed and will be before the FPC in the rate proceeding.

15. Federal Power Act § 205(a), 16 U.S.C. 824d(a) (1964).

16. Federal Power Act § 205(e), 16 U.S.C. 824d(e) (1964).

to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect * * *.

If the proceeding has not been concluded at the expiration of the suspension period, the newly filed rate goes into effect, but the FPC has the authority to order refunds, with interest, of such portions of increased charges or rates as it ultimately decides are not justified.

This statutory structure "not only gives the [utility] opportunity to increase its rates where justified but likewise guarantees that the consumer may recover refunds for moneys paid under excessive increases." Atlantic Refining Co. v. Public Service Comm'n, *supra*, 360 U.S. at 389, 79 S.Ct. at 1254. *See also* Hope Natural Gas Co. v. FPC, 196 F.2d 803, 806–807 (4th Cir. 1952).

In its Order of April 29, 1970, the FPC found that "The proposed increased rates and charges contained in [Edison's] Rate S–1 have not been shown to be justified and may be unjust, unreasonable, unduly discriminatory, or preferential, or otherwise unlawful under the Federal Power Act." Thus it set the matter for investigation and hearing. To preserve its power under the Act to order refunds, it ordered a suspension,[17] but the suspension's duration was only for one day. The claim put to us by the Towns is essentially the position taken in dissent by Commissioner Carver, who stated that the one day suspension was a departure from prior FPC practice of suspending major rate increases for the full five months allowed by the Act, and added:

"Any 'irretrievable loss' that might result from suspension for five months

should be put in realistic perspective. Over the maximum suspension period, the increase sought by Boston Edison represents about six-tenths of one per cent of its total annual revenues from the sale of electricity. By contrast, the interim cost increase to its five municipal customers would exceed 5.5% of their total annual electric utility operating income. Any risk of uncertainty would thus work much harsher consequences upon the customer than the rate increase applicant."

### A. *Reviewability of suspension orders.*

The FPC asserts that "the exercise of a federal regulatory agency's *discretion* with respect to suspending a rate change is not reviewable." We are not aware of precedents under the Federal Power Act. The parties rely on cases concerning nearly identical suspension provisions of other rate setting laws.

A leading precedent is Arrow Transportation Co. v. Southern Ry. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). The Interstate Commerce Commission had there suspended a schedule of reduced railroad rates for the maximum period of seven months authorized by § 15(7) of the Interstate Commerce Act, but had not reached a decision as to the rates' lawfulness by the time the suspension order (and a further voluntary postponement by the railroads) had expired. When competitors sued to enjoin the railroads from making the rate reduction effective pending the ICC's decision, the Supreme Court held that Congress vested in the ICC "the sole and exclusive power to suspend" and withdrew from the judiciary "any pre-existing power to grant injunctive relief." 372 U.S. at 658, 83 S.Ct. at 989.

The Court, reasoning in large part from the history of the Interstate Commerce Act,[18] considered that an injunc-

---

17. See Mobile Gas Service Corp., 12 FPC 1422, 1424 (1953), rev'd on other grounds *sub nom.* Mobile Gas Service Corp. v. F.P.C., 215 F.2d 883 (3d Cir. 1954), aff'd *sub nom.* United Gas Pipeline Co.

v. Mobile Gas Service Corp., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956).

18. Before the ICC was given the power to suspend new rates, the courts had disagreed whether they had the power to

tive power in the courts pending ICC consideration would interfere with that Commission's primary jurisdiction to determine the lawfulness and reasonableness of rates.

" * * * A court's disposition of an application for injunctive relief would seem to require at least some consideration of the applicant's claim that the carrier's proposed rates are unreasonable. But such consideration would create the hazard of forbidden judicial intrusion into the administrative domain. * * * If an independent appraisal of the reasonableness of rates might be made for the purpose of deciding applications for injunctive relief, Congress would have failed to correct the situation so hazardous to uniformity which prompted its decision to vest the suspension power in the Commission." (372 U.S. at 669–671, 83 S.Ct. at 991.)

The Court concluded "that Congress meant to forelose a judicial power to interfere with the *timing* of rate changes which would be out of harmony with the uniformity of rate *levels* fostered by the doctrine of primary jurisdiction." (*Id.* at 668, 83 S.Ct. at 990; emphasis in original.)

The Towns say that while the decision whether and for how long a rate filing is to be suspended calls for the exercise of FPC discretion, "the exercise of that discretion is in no sense invulnerable to judicial review." They rely on the line

of cases springing from Amarillo-Borger Express, Inc. v. United States, 138 F. Supp. 411 (N.D.Tex.1956) (three-judge court), vacated as moot, 352 U.S. 1028, 77 S.Ct. 594, 1 L.Ed.2d 598 (1957).[19] These cases, all preceding *Arrow Transportation,* involve the special situation of an order vacating a prior suspension, where the initial order was accompanied by statutorily prescribed reasons but the latter order contains no new findings or only pro forma reasoning.

However, Freeport Sulphur Co. v. United States, 199 F.Supp. 913 (S.D.N.Y. 1961) (three-judge court) refused to follow the *Amarillo-Borger* line of cases. Judge Swan's opinion echoed his dissenting observation in Long Island RR v. United States, *supra,* 140 F.Supp. at 830:

The Statute, 49 U.S.C.A. § 15(7), does not require the Commission to state its reasons when suspension of proposed rates is denied; only when suspension is granted must reasons be stated. Since vacation of a prior suspension order has the effect of a denial of suspension thereafter, it may be doubted whether the vacating order need state reasons.

Compare Long Island RR Co. v. United States, 193 F.Supp. 795, 800 (E.D.N.Y. 1961) (three-judge court), where Judge Friendly's comprehensive opinion concludes that suits to enjoin suspension orders "may be entertained if, but only if, the complaint shows that the suspension is plainly without statutory authori-

---

enjoin rate changes pending ICC determination. Congress's grant of the suspension power to the ICC thus promoted "the regulatory goal of uniformity." 372 U.S. at 664, 83 S.Ct. 984. Furthermore, Congress engaged in a controversy lasting nearly two decades concerning the length of the suspension period, and it gave the ICC power to order refunds where the hearings outlasted the suspension, showing its awareness that some shippers might have to pay unlawful rates for a time. *Id.* at 664–666, 83 S.Ct. 984. Thus the Court reaffirmed its earlier statement in Board of Railroad Comm'rs v. Great Northern Ry. Co., 281 U.S. 412, 429, 50 S.Ct. 391, 74 L.Ed. 936 (1930): "This power of suspension was entrusted to the Com-

mission only." *Id.* at 667, 83 S.Ct. at 989.

19. Long Island Railroad Co. v. United States, 140 F.Supp. 823 (E.D.N.Y.1956) (three-judge court) followed *Amarillo-Borger* but noted that an initial refusal or grant of suspension is nonreviewable. *See also*, Dixie Carriers, Inc. v. United States, 143 F.Supp. 844 (S.D.Tex.1956) (three-judge court), vacated as moot *sub. nom.* Atchison, T. & S.F. Ry. Co., 355 U.S. 179, 78 S.Ct. 258, 2 L.Ed.2d 186 (1957); *cf.* Seatrain Lines, Inc. v. United States, 168 F.Supp. 819 (S.D.N.Y.1958) (three-judge court); Atlantic Coast Line RR Co. v. United States, 173 F.Supp. 871 (E.D.Va.1958) (three-judge court).

ty or violates 'a clear statutory command' and that the complaining party has no other available remedy." Subsequent decisions have denied judicial review to orders vacating prior suspension orders and have explicitly rejected the *Amarillo-Borger* line.[20]

Whether or not the *Amarillo-Borger* line of cases survives *Arrow Transportation*, it is settled that the refusal to suspend a filed rate is a nonreviewable exercise of agency discretion.[21]

While the point is not absolutely decisive it is material and meaningful that the Towns have been put in a far more advantageous position by the one-day suspension than if the FPC had decided, in a plainly nonreviewable exer-

cise of discretion, not to suspend Edison's filing at all. The suspension, and the FPC's findings leading it to order the suspension and hearing, have kept the burden of proof on Edison to justify its proposed rate increase and have enabled the FPC to order refunds, with interest, of such portion of the increased rates as the FPC's decision may find not to be justified.[22] While the FPC's refund authority may be inadequate to protect the customer's interests fully, see FPC v. Hunt, 376 U.S. 515, 524–525, 84 S.Ct. 861, 11 L.Ed.2d 878 (1964), the fact that a decision not to suspend is committed by law to the agency's discretion supports the conclusion that the limited suspension order in this case is not subject to judicial review.[23]

**20.** Oscar Mayer & Co. v. United States, 268 F.Supp. 977 (W.D.Wisc.1967) (three-judge court) (decision also based in part on failure to exhaust administrative remedies) ; Naph-Sol Refining Co. v. United States, 269 F.Supp. 530 (W.D.Mich. 1967) (three-judge court).

**21.** Luckenbach Steamship Co. v. United States, 179 F.Supp. 605, 609–610 (D.Del. 1959), vacated as moot, 364 U.S. 280, 80 S.Ct. 1611, 4 L.Ed.2d 1719 (1960) ; National Industrial Traffic League v. United States, 287 F.Supp. 129 (D.D.C.1968) (three-judge court) ; Movers' and Warehousemen's Association v. United States, 227 F.Supp. 249 (D.D.C.1964) (three-judge court) ; Bison Steamship Corp. v. United States, 182 F.Supp. 63 (N.D.Ohio 1960) (three-judge court) ; Carlsen v. United States, 107 F.Supp. 398 (S.D. N.Y.1952) (three-judge court).

The courts have also refused to review orders granting suspension, at least where the order is within the powers delegated to the Commission by statute. *See, e. g.,* Naph-Sol Refining Co. v. United States, *supra* note 20; Great Western Packers Express, Inc. v. United States, 246 F. Supp. 151 (D.Colo.1965) (three-judge court) ; Long Island RR Co. v. United States, 193 F.Supp. 795, 798–799 (E.D. N.Y.1961) (three-judge court).

Professor Davis has concluded that *Arrow Transportation* forecloses judicial review of suspension orders, K. Davis Administrative Law Treatise § 28.16 (Supp. 1970) at 966:

"One important area of administrative action in which judicial review is

unavailable even if the agency acts arbitrarily or in abuse of discretion involves the suspension or refusal to suspend newly filed rates. The determination of whether to suspend or to allow the rates to go into effect is typically committed to the agency. The determination is protected neither by hearing safeguard nor by judicial review."

**22.** Federal Power Act § 205(e), 16 U.S.C. 824d(e) (1964).

**23.** The refusal to suspend held reviewable in Environmental Defense Fund, Inc. v. Hardin, 138 U.S.App.D.C. 391, 428 F.2d 1093 (1970) is similar in name only to the suspension powers of rate-making agencies. Pesticides and other "economic poisons" must be registered under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 135–135k (1964). Registration under the Act can be suspended to avert an imminent hazard to the public, an interim procedure that expedites the lengthy statutory procedure necessary for full cancellation of registration. We held that administrative inaction—in the form of taking no action on a petition to suspend certain pesticides —was "tantamount to an order denying suspension" and was sufficiently ripe for judicial review "because the Secretary's inaction results in a final disposition of such rights as the petitioners and the public may have to interim relief." 138 U.S.App.D.C. at 397, 428 F.2d at 1099. We required a showing of "clear evidence of legislative intent" to preclude judicial review; permissive statutory language could not, in itself, suffice to show that

Our ruling that the one-day suspension order is not subject to judicial review, either as to the granting of the one-day suspension or the denial of a five-month suspension, is in accord with this court's recent opinion in Associated Press v. FCC, ── U.S.App.D.C. ──, 448 F.2d 1095 (July 12, 1971). Our ruling is in the context of the kind of claim presented to us—that there has been an abuse of agency discretion. We do not speak to a case where the claim is that the suspension action taken or declined by the agency is plainly without any statutory authority or in defiance of a "clear and mandatory" statutory command or reflects an error evident on the face of the papers—considerations which have been held to constitute an exception, a basis for judicial correction in the case of other types of agency action which Congress has withdrawn from judicial review jurisdiction.[24] We also need not consider whether a basis for this exception would be established by an agency's failure, evident on the face of the papers, to enter even a one-day suspension order that maintains the agency's ability to require a substantiation of the rate increase and to provide effective refunds for rate increases not substantiated.

## IV. NOTICE TO THE PUBLIC

Section 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d) (1964), provides:

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public.

The FPC has issued implementing regulations which we consider below.

Edison submitted its initial rate filing on January 29, 1970. On March 17, 1970, the FPC Secretary wrote Edison a letter requesting additional information, including cost and cost-of-service information, "in order to complete your filing" because, "[a]fter reviewing the entire filing the staff finds the filing deficient." Certain questions were required to be answered "to permit the staff to analyze your filing." Edison submitted the requested information on March 30, 1970, and the FPC found that its filing was not complete until that date. (Order of April 29, 1970, R. 581). In response to Edison's request, the FPC set the effective date of the rate increase at May 1, 1970.

The complaint put to us by the Towns, supported by Boston Gas Co., as amicus curiae, is that the FPC committed reversible error in permitting the filing to become effective only thirty days after completion because the FPC's regulations also contain § 35.13(b) (4) (i), which we shall refer to as the 60-day provision. This requires that

"if the rate schedule provides for an increased rate, then 60 days prior to the date that such changed rate is proposed to become effective the filing utility shall submit a statement showing its cost of the service to be sup-

---

the action was committed by law to agency discretion. *Id.* at 396, 428 F.2d at 1098. *See also* Medical Committee for Human Rights v. S.E.C., 139 U.S.App.D.C. 226, 432 F.2d 659 (1970), cert. granted, 401 U.S. 973, 91 S.Ct. 1191, 28 L.Ed.2d 322 (1971). The history of the suspension power of the ICC and the long line of cases holding refusals to suspend filed rates nonreviewable exercises of agency discretion place this case in a clearly different context.

24. *See* Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958) ; Long Island RR. Co. v. United States, 193 F. Supp. 795 (E.D.N.Y.1961) (three-judge court) ; Int'l Ass'n of Mach. & Aerospace Workers v. Nat'l Mediation Bd., 138 U.S.App.D.C. 96, 105, 425 F.2d 527, 536 (1970) ; Int'l Bro. of Teamsters v. Brotherhood of Ry., Airline & Steamship Clerks, 131 U.S.App.D.C. 55, 64, 402 F.2d 196, 205, cert. denied *sub nom.* Brotherhood of Ry., Airline & Steamship Clerks v. National Mediation Board, 393 U.S. 848, 89 S.Ct. 135, 21 L.Ed.2d 119 (1968) ; Int'l Ass'n of Tool Craftsmen v. Leedom, 107 U.S.App.D.C. 268, 276 F.2d 514 (1960).

plied under the new rate schedule * * *. Simultaneously, the public utility shall submit [certain] material on sales and revenues * * * and, unless the rate schedule containing the proposed increased rate is likewise simultaneously filed, a summary statement of such proposed increased rate."

FPC counsel argues that the 60-day provision means only that the Commission Staff requires certain information 60 days prior to the effective date; the public is provided 30 days notice of the rate schedule by the statute and § 35.3 of the Regulations, and the public received such notice in this case.

The information required by the 60-day provision is different from the actual filing. Its requirement of a "summary statement" of the proposed increased rate is applicable only if the actual rate schedule is not simultaneously filed. This summary statement "shall not be in lieu of the rate schedule."

However the 30-day requirement of the law has been implemented by FPC regulations. In particular 18 C.F.R. § 35.2 provides, in para. (e):

"(e) *Effective date.* As used herein the 'effective date' of a rate schedule shall mean the date on which a rate schedule filed and posted pursuant to the requirements of this part is permitted by the Commission to become effective as a filed rate schedule. The effective date shall be 30 days after the filing date, or such other date as may be specified by the Commission."

And it further provides in para. (c):

"(c) *Filing date.* The term 'filing date' as used herein shall mean the date on which a rate schedule filing is completed by the receipt in the office of the Secretary of all supporting cost and other data required to be filed in compliance with the requirements of this part, unless such rate schedule is rejected as provided in § 35.5. If the material submitted is found to be incomplete, the Secretary will so notify

the filing utility within 30 days of the receipt of the submittal."

The 60-day provision of § 35.13(b) (4) (i), prescribed by the Commission in the event of rate increases, is included in the same part (Part 35) of the regulations, and the material required by the 60-day provision is one of the "requirements of this part" referred to in § 35.2 (c).

The FPC's actions show that it thought that the 60-day requirement was applicable. After the FPC's April 29, 1970, Order, the Towns and Boston Gas pointed out the violation of the 60-day provision, § 35.13(b) (4) (i), claiming that they had insufficient time to arrange for tracking increases to their customers. In its Order Denying Joint Motion for Emergency Amendment of Order issued May 26, 1970, the Commission stated that Edison had requested a filing date 30 days after its submission of the additional information requested by the FPC. "That request was, in essence, a request for waiver of our 60-day notice provision under the Regulations. The legal effect of our order was to waive the notice provision. * * *" If the 60-day provision was not applicable, there would have been no necessity for the Commission to waive it.

Section 1.7(b) of the FPC Rules of Practice and Procedure provides for petitions for waiver of rules. But Edison did not follow the Rule and make a formal petition for waiver. As Commissioner Carver said, dissenting from the May 26 Order:

It is clear beyond doubt that the Commission could have waived the time requirements involved, but I think the plain fact is that it did not. Waiver of a regulation having the effect of law is not a matter to be taken lightly: to me, it requires a conscious, affirmative and specific intent and action thereon. The fact is that Section 35.13(b) (4) (i) of the Regulations played no part in the consideration of this matter. A Waiver may not be constructed out of an action which merely ignores the regulation.

While the FPC's handling of the matter leaves something to be desired, we find no basis on which this court may properly reverse the order before us. The data filed pursuant to the 60-day provision, § 35.13(b) (4) (i), is available to the public when filed. So we were advised at oral argument. That does not mean that the public has a right that is enforceable in court to insist on a utility's adherence to this section, either as to contents or timeliness of the utility's filing. We think the applicable doctrine is provided by American Farm Lines v. Black Ball Freight Service, *supra*. In that case, appellant applied to the ICC for temporary operating authority but failed to comply strictly with certain ICC rules requiring particular information to be set forth in support of such applications.[25] The ICC granted the temporary authority and other carriers protested. The Court described the problem before it as follows (397 U.S. at 538, 90 S.Ct. at 1292):

> It is argued that the rules were adopted to confer important procedural benefits upon individuals; in opposition it is said the rules were intended primarily to facilitate the development of relevant information for the Commission's use in deciding applications. * * *

The Court held that the ICC had discretion to accept and act on applications that adequately, if not literally, complied with its rules. Such "rules were not intended primarily to confer important procedural benefits upon individuals," *Id.*, and are best treated "not as inflexible procedural conditions but as tools to aid the Commission in exercising its discretion. * * * " (*Id.* at 539, 90 S.Ct. at 1292).

Similarly in the case before us we think the 60-day provision of the regulations, set forth in § 35.13(b) (4)

(i), was designed to enhance the ability of the FPC Staff to make the important threshold decision expeditiously upon the filing of the later statutory 30-day notice, as to whether to order an investigation and hearing, or a suspension, or both. When Part 35 of the FPC Regulations as completely amended to its present form, the FPC stated, "More detailed cost and other data will be required hereafter in support of rate schedule submittals, which will enable the Commission to process rate schedule filings more expeditiously." Order No. 271, 28 Fed.Reg. 10572, 30 FPC 850 (1963). While we do not think it can fairly be said that the FPC "waived" its 60-day filing requirement, we conclude that this requirement does not confer a procedural benefit on other parties that entitles them to secure a judicial reversal in the event of non-compliance.

The rights of interested parties are established by the statute, which provides for 30 days' notice. 16 U.S.C. § 824d(d). The FPC Regulations, § 35.8, provide for submission of comments by "any purchaser or interested party" within 20 days of the filing date. In ordinary course a utility proposing a rate increase will have complied with the 60-day provision and the purchaser will have more notice, in substance, than is safeguarded by this 20-day provision. The utility would not lightly take the risk of a failure to observe the 60-day requirement and of the Commission's consequent rejection or delay of its rate filing for failure to comply with the 60-day provision.

The Commission's order shows that it considered all timely comments. The FPC's failure to require observance of the 60-day provision, and of the notice afforded thereby, does not entitle Petitioners to a judicial mandate vacating the FPC's order.

Affirmed.

---

25. To establish an immediate and urgent need for the service, applications were required to show efforts made to obtain it and names and addresses of existing carriers failing to provide it.