571 P.2d 1119

**INTERMOUNTAIN GAS COMPANY,**
Appellant,

v.

**IDAHO PUBLIC UTILITIES
COMMISSION, Respondent.**

No. 12031.

Supreme Court of Idaho.

Nov. 25, 1977.

Barry Marcus of Marcus & Marcus, Boise, for appellant.

Wayne L. Kidwell, Atty. Gen., Dan L. Poole, Asst. Atty. Gen., Boise, for respondent.

BISTLINE, Justice.

On May 16, 1975, Intermountain Gas Company (Intermountain) filed with the Idaho Public Utilities Commission (the Commission or PUC) an application for a general rate increase to meet an estimated revenue deficiency of approximately $3.6 million. The application also sought changes in Intermountain's rate structure. This application was designated as IPUC # U–1034–47. On the same date, Intermountain also filed an application for an increase in rates to be effective on October 15, 1975. This increase of approximately $0.8 million was based on higher gas costs which would result from Intermountain's proposed participation in a program to import additional gas supplies from Canada, known as the "Zama" gas project. This application was designated IPUC # U–1034–48.

The general rate increase was scheduled to become effective on June 15, 1975. The Commission, pursuant to its statutory authority, suspended the proposed rates for 6 months by Order # 11930, entered June 3, 1975. On June 20, 1975, the Commission, in IPUC Order # 11966 (on appeal here), dismissed Intermountain's application in IPUC Case # U–1034–47 (the general rate increase) without prejudice to further application in accordance with the order. The Commission found Intermountain's application to be defective for three reasons: (a) the revenue figures used in computing the revenue deficiency for Case # U–1034–47 incorporated the proposed rate increase in Case # U–1034–48, namely the amount necessary to track Intermountain's higher gas costs due to participation in the Zama project; (b) the exhibits accompanying the application failed to indicate proposed changes by an appropriate character as required by I.C. § 61–307; and (c) the application failed to include a cost of service study to support Intermountain's proposed changes in rate allocation design.

In response to the Commission's order of dismissal, Intermountain filed a motion to vacate the order and a petition for rehearing. On July 14, 1975, the Commission heard oral argument on Intermountain's motion and petition. In Order # 12070 (also on appeal here), entered August 8, 1975, the Commission denied Intermountain's motion and petition. Intermountain filed its notice of appeal from Orders # 11966 and 12070 on September 5, 1975.

## I.

The Commission argues, first, that the issues on appeal in this case have long since become moot. On February 27, 1976, Intermountain filed with the PUC an application for a general rate increase of approximately $6.5 million, designated IPUC # U–1034–57. This application was apparently in compliance with the requirements of IPUC Order # 11966. Intermountain presented its direct evidence on this rate application on March 8–10, 1976. Relief was granted on this application in August, 1976. The Commission argues that, in general, a rate application is rendered moot by a second, superseding rate application and that, in particular, the August, 1976, order granted Intermountain all the relief it was entitled to at that time. Intermountain replies that its 1976 application differed

from its 1975 application in such crucial particulars as the test period, the relief requested and the effective dates. Specifically, Intermountain claims that its 1975 rate increase was due to take effect, at the latest, on December 15, 1975; that no relief was forthcoming until the Commission order in August, 1976; and that, consequently, Intermountain incurred losses from December, 1975, to August, 1976, which have never been recouped.[1]

More importantly, Intermountain argues that the procedures questioned here present the classic case for review in that they create a recurring problem which, in the very nature of things, will always escape review. In today's inflationary economy, a later rate application will frequently have superseded the order in dispute before the Supreme Court's timetable permits appellate review thereof. We agree. The matters considered herein are of on-going importance to the operation of the Commission and procedural errors which we note can be avoided by the Commission in the future.

## II.

■ Intermountain's main contention on appeal is that I.C. § 61–622 as amended in 1975[2] forbids the action taken here by the Commission in dismissing a rate increase application without a hearing. According to Intermountain, the options available to the PUC once a utility has filed a rate increase are limited, under the present statutory framework, to the following:

1. If the PUC takes no action at all, the rates automatically go into effect in 30 days.

2. The PUC can suspend the effective date of the proposed rate increase, in which case,

a) If the PUC takes no further action at all, the rates automatically go into effect at the end of the suspension order or after 6 months, whichever comes first;

b) or, the PUC can give notice and hold an evidentiary hearing after which

(i) it must either approve the rate increase as proposed by the utility,

(ii) or declare the proposed rates improper and itself set such rates as are just and reasonable.

In short, Intermountain reads the present statute to say that the sole power the PUC

1. The precise mathematics of this dispute, is not clear from the record before us on appeal. At oral argument, counsel for the Commission stated that Intermountain had recouped its losses by way of interim relief orders and the permanent order of August, 1976. Counsel for Intermountain maintained the opposite. As noted in the text, our resolution of the mootness question does not hinge on the outcome of this dispute, the details of which must be settled on remand to the Commission.

2. "61–622. No public utility shall raise any rate, fare, toll, rental or charge or so alter any classification, contract, practice, rule or regulation as to result in an increase in any rate, fare, toll, rental or charge, under any circumstances whatsoever, except upon a showing before the commission and a finding by the commission that such increase is justified. The commission shall have power, and is hereby given authority, either upon complaint or upon its own initiative without complaint, at once, and if it so orders, without answer or other formal pleadings by the interested public utility or utilities, but upon reasonable notice, to enter upon a hearing concerning the propriety of such rate, fare,

toll, rental, charge, classification, contract, practice, rule or regulation, and pending the hearing and decision thereon, such rate, fare, toll, rental, charge, classification, contract, practice, rule or regulation shall not go into effect; provided, that the period of suspension of such rate, fare, toll, rental, charge, classification, contract, practice, rule or regulation shall not extend beyond thirty (30) days when such rate, fare, toll, rental, charge, classification, contract, practice, rule or regulation would otherwise go into effect, unless the commission in its discretion extends the period of suspension for a further period not exceeding five (5) months; provided further, that prior to the expiration of said periods of suspension the commission may, with the consent in writing signed by the party filing such schedule, permanently or further suspend the same. On such hearing, the commission shall establish the rates, fares, tolls, rentals, charges, classifications, contracts, practices, rules or regulations proposed, in whole or part, or others in lieu thereof, which it shall find to be just and reasonable."

has when faced with a proposed rate increase is either to allow the rates to go into effect or to hold a full evidentiary hearing on the merits of the case and then either accept the rates proposed by the utility or set new rates itself. *See Willmut Gas and Oil Co. v. Federal Power Comm'n,* 111 U.S. App.D.C. 49, 294 F.2d 245 (1961), *cert. denied,* 368 U.S. 975, 82 S.Ct. 477, 7 L.Ed.2d 437 (1962).[3]

The Public Utilities Commission does not seriously dispute the fact that Intermountain's reading of the statute is correct as to the steps which must be followed in the normal processing of rate increase applications. The Commission argues, however, that it cannot be made to waste its staff's time and the taxpayers' money by examining and holding hearings on the occasional application which is defective on its face. In such cases, the Commission, argues, it has a right to dismiss an application outright without holding a hearing on the merits.

That a regulatory commission needs some such power has long been recognized in the law of public utilities' regulation. The classic treatment of the topic is found in *Municipal Light Boards, etc., Mass. v. Federal Power Comm'n,* 146 U.S.App.D.C. 294, 298–299, 450 F.2d 1341, 1345–46 (1971).

> "We begin our consideration with some general reflections concerning the significance in administrative law terms of an agency's 'rejection' of a filing. The FPC's regulations under the Federal Power Act provide that the Commission's Secretary shall reject any filing 'which patently fails to substantially comply' with applicable requirements of the Commission's regulations and rules of practice.
>
> "There is a sound use, and indeed requirement, of an agency 'rejection' of a party's

filing. But it should mark the clear case of a filing that patently is either deficient in form or a substantive nullity. . . .

> "A 'rejection' of a filing . . . [is] like a motion to dismiss on the face of the pleading, and indeed goes even beyond that. It is appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest.
>
> "It is 'a peremptory form of response to filed tariffs' which classically is used not to dispose of a matter on the merits but rather as a technique for calling on the filing party to put its papers in proper form and order. Its use is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket."

In the *Municipal Light Boards* case, the authority of the F.P.C. to enact a regulation providing for the "rejection" of defective filings was upheld within the context of a statutory framework virtually identical with that governing the Idaho Public Utilities Commission:

> "The pertinent considerations may go beyond mere administrative choice in docketing techniques, as appears from the statutes governing rate filings, where a filing once lodged is permitted to go into effect, either at once, if not suspended, or at any rate after a suspension period subject to a time limit.
>
> ". . . In these situations a rate filing may be rejected both when the governing statute explicitly provides for rejection and when it does not. The Com-

---

**3.** Intermountain also argues that its right to a hearing prior to a Commission determination that its filed rates are improper is also guaranteed by Idaho's Administrative Procedure Act, I.C. § 67–5209 and its due process rights under both the United States and Idaho constitutions. While each of these contentions is undoubtedly true, they mischaracterize the action taken in the present case. The Commission has not

denied Intermountain's application nor determined that its proposed rate increase is improper. The Commission has simply dismissed the application without prejudice to refiling it once it was corrected in the particulars noted. Though we hold the action taken by the Commission to be in error in this case, it is nonetheless important to keep the two responses distinct.

mission had the authority to issue a regulation . . . for the rejection of filings that patently fail to establish substantial compliance with duly issued regulations.

"This rests on its basic statutory authority to issue regulations 'necessary or appropriate to carry out the provisions of the Act.' This authority is 'not restricted to procedural minutiae' and provides latitude for administration in furtherance of Congressional purposes, including this 'rejection' regulation." 146 U.S.App.D.C. at 299, 450 F.2d at 1346.

Several key policy considerations underlie the Commission's power to reject applications which fail to set forth all data relevant to the necessity and reasonableness of the relief requested.[4] The traditional administrative prefiling requirement enables the Commission to conduct a preliminary review of the application to determine whether a suspension order should be entered and whether a full scale evidentiary hearing is warranted. It allows other parties to begin immediate preparation of their rebuttal cases. It "freezes" the applicant's direct case, thus preventing unfair surprise at a formal hearing. Without such a prefiling requirement, the efficient processing of rate increase applications would be impossible within the seven month time limit imposed by I.C. § 61–622.

■ It is equally clear, however, that the power of the Commission to reject a utility's rate increase application is severely circumscribed. In the *Municipal Light Boards* case, the D.C. Circuit Court of Appeals put two limitations on the exercise of this power. In the first place, it may be invoked only when the application is "patently deficient in form" or "patently a nullity as a

matter of substantive law." Secondly, the court implies that the power may be invoked only pursuant to explicit authorization, either by statute or administrative rule. In the present case, we find that neither condition has been fulfilled and we therefore set aside the Commission order.

■ In this case, the Commission dismissed Intermountain's rate increase application for the stated reason,

"THAT Exhibit A accompanying Intermountain Gas Company's application in Case No. U–1034–47 is fatally defective because it incorporates the proposed rate increase in Case No. U–1034–48 in the Applicant's revenue figures."[5]

In other words, the application was dismissed because Intermountain incorporated revenue figures resulting from the proposed rate increase due to the Zama gas project with the revenue figures used for the general rate increase. While it is true that the incorporation of the proposed Zama gas increase turned out to be incorrect (permission to participate in the project was eventually denied), we hold that the defect did not render Intermountain's application so patently deficient in form or so patently a nullity as a matter of substantive law as to justify the Commission's outright rejection and dismissal of the application.

■ It is standard practice to base a rate increase application on an expected revenue deficiency, calculated on figures from a "test year." These figures, however, must be modified to incorporate any upcoming increases which are "known and measurable." *West Ohio Gas Co. v. Public Utilities Commission of Ohio,* 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773 (1935). Otherwise, the test year figures are obsolete before the

---

**4.** *See,* Idaho Public Utilities Commission Rules of Practice and Procedure, §§ 6.6 and 16.1.

**5.** Two other defects were likewise observed:
"THAT Exhibits B and C accompanying the application are defective because they fail to indicate proposed changes by an appropriate character, as required by Section 61–307, *Idaho Code.*
"THAT the application is defective because it fails to include any data or evidence support-

ing the Applicants' proposed rate design modifications."
Neither of these deficiencies were found to be "fatally defective." By the Commission's own admission, the failure to indicate proposed changes by an appropriate character was a *de minimis* objection. The failure to include a cost of service study in support of the proposed rate design modification will be discussed *infra.*

new rate increase is even granted. Had Intermountain *not* included its hoped-for Zama rate increase in its general rate increase application, it might have been criticized by the Commission for omitting the known and measurable costs attendant to its already announced plans. The net effect of including the Zama rate increase was to lower the amount being requested in the general rate increase application. That Intermountain's inclusion of the Zama rate increase did not render its general rate increase application "patently deficient" in form or "patently a nullity as a matter of substantive law," is clear from the Commission's order itself. The order states that the supposedly fatal defect could be cured on reapplication by the simple device of supplying "alternative exhibits, excluding the proposed increase in Case No. U–1034–48 [the Zama gas case] in one set of exhibits and including it in another."

The Commission likewise violated the second standard set down in *Municipal Light Boards,* namely, that it exercise the severe remedy of "rejection" pursuant to clearly delineated authorization, either by statute or administrative rule. At the time of the dismissal in this case, the sole rule governing the handling of defective applications read as follows:

> "Upon the filing of any pleading, it will be inspected by the Commission and if found to be defective or insufficient, it may be returned to the party filing it for correction." Rule 6.4.

It was not until January 1, 1975—ten days *after* the dismissal order entered in this case—that Rule 6.4 was amended to read:

> ". . . it may be returned to the party filing it for correction *or in the discretion of the Commission may be dismissed or disregarded.*"

It is thus clear that when the Commission entered its dismissal order on June 20, 1975, there was no rule on the books which could have warned Intermountain or any other utility applying for a rate increase that a defective application might be "dismissed" rather than merely "returned."

The Commission argues that the pragmatic consequences of a "return" are the same as those following upon a "dismissal." This is incorrect. If the Commission had chosen to "return" Intermountain's application for correction, its action would have merely tolled the running of the statutory 6-month time limit. Such a tolling effect is necessary and reasonable. Otherwise, an applicant could simply sit on the defective application until the suspension period ran out and then claim the new rates were automatically in effect. The legislature did not intend for a utility so to profit from a defective application when it enacted the statutory framework of I.C. § 61–622. When the application is corrected, however, the 6-month period again begins to run *from the point at which it was interrupted.*

By contrast, a "dismissal" is a more drastic act which serves to put the applicant back on square one in the rate application process. Such action may properly be taken only *before* the suspension order is entered, which is to say, during the first 30 days an application is on file. This is in keeping with I.C. § 61–307 which states that no change in rates shall become effective,

> ". . . except after thirty (30) days' notice to the commission and to the public as herein provided. Such notice shall be given by filing with the commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force, and the time when the change or changes will go in to effect."

In short, the effect of "returning" an application for correction or "dismissing" it without prejudice to refile is the same when done *prior to the issuance of a suspension order.* The application is no longer filed with the Commission, open for public inspection or stating plainly the changes to be made. Therefore, the mandatory 30 days' notice provision of I.C. § 61–307 does not begin to run again until the application is returned to the Commission in correct form.

On the contrary, once the suspension order has issued, an application may no longer be "dismissed"; it may only be "returned" for correction. Any other holding would open the door to possible abuse and might frustrate the seven month time limit dictated by the legislature when it, in its wisdom, created the statutory framework which is now I.C. § 61–622. This time limit could be indefinitely extended if, for example, the Commission chose to "dismiss" an application five months after a suspension order, and thus place the utility back at the very beginning of the application process. Such drastic action is permissible only if the application is patently defective in form or patently a nullity as a matter of substantive law—a determination which can surely be made within 30 days after the application is filed. A "return" of the application works no such violence to the statutory time framework since it merely tolls the running of the statutory period until such time as the application is corrected. The economic incentive for the utility to correct the application and once again have it "on file," is such that any time lost due to a "return" will be kept to an absolute minimum.

■ In sum, the traditional requirement of full and adequate prefiling serves important functions in rate increase applications. Pursuant to I.C. § 61–501 and I.C. § 67–5202, the Idaho Public Utilities Commission may properly issue rules providing for procedures to be used in assuring compliance with this requirement. Specifically, it may reject applications which are patently defective in form or patently a nullity as a matter of substantive law. Such rejections *prior to the issuance of a suspension order* may take the form either of a "dismissal" or a "return" for corrections. The effect of either approach is to place an applicant back at the beginning of the application process. Once a suspension order has issued, however, the Commission may only "return" an application for correction. The effect of such a "return" is to toll the running of the statutory time period; once the application is corrected and once again on file, the time again begins to run from the point at which it was interrupted.

### III.

■ The Commission attempts one last defense of its conduct in this case by claiming, on appeal, that the crucial defect in Intermountain's application was not the one held "fatally defective" in its dismissal order (namely, the inclusion of the proposed Zama gas increases in its general rate increase application) but rather the absence of a cost of service study to justify the proposed rate design modifications. The Commission argues that its dismissal of Intermountain's application on these latter grounds amounted to a rule-making determination that applications which propose rate design modifications will be dismissed whenever they fail to include a cost of service study to justify the departure from the methods of rate allocation. Reliance is placed upon *United States v. Storer Broadcasting Co.,* 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956) and *F. P. C. v. Texaco, Inc.,* 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964). Such reliance is misplaced. In both *Texaco* and *Storer,* the substantive policy rule had been adopted in a prior proceeding after notice and hearing; both Texaco and Storer had received notice of the agency's hearing on its proposed rule and had participated in the hearing; neither had appealed from adoption of the rule. None of these conditions were met in the present case. It is impossible to read *Texaco* and *Storer* to stand for the proposition that a regulatory commission may dispense with the normal rule-making procedures, spelled out in I.C. §§ 67–5203 and –5305, promulgate a rule in the midst of an adjudicatory process, and then apply that rule retroactively to the party whose rights are being adjudicated. The orders of the Idaho Public Utilities Commission # 11966 and # 12070, of June 20, 1975, and August 8, 1975, respectively, are set aside. *Intermountain Gas Company v. Idaho Public Utilities Commission,* 97 Idaho 113, 129–30, 540 P.2d 775 (1975).

McFADDEN, C. J., and DONALDSON and BAKES, JJ., concur.

SHEPARD, J., dissents without opinion.