MUNICIPAL ELECTRIC UTILITY AS-
SOCIATION OF ALABAMA et al.,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

Alabama Power Company, Intervenor.

BALDWIN COUNTY ELECTRIC MEM-
BERSHIP CORPORATION et al.,
Petitioners,

v.

FEDERAL POWER COMMISSION,
Respondent,

Alabama Power Company, Intervenor.

Nos. 72–1293, 72–1294.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 26, 1973.

Decided June 29, 1973.

Arnold Fieldman, Washington, D. C., with whom Reuben Goldberg, Washington, D. C., was on the brief, for petitioners in No. 72–1293.

D. Biard MacGuineas, Washington, D. C., with whom Bennett Boskey, Washington, D. C., was on the brief, for petitioners in No. 72–1294.

Platt W. Davis, III, Atty., F. P. C., with whom Leo E. Forquer, Acting Gen. Counsel, and George W. McHenry, Jr., First Asst. Sol., F. P. C., were on the brief for respondent. Gordon Gooch, Gen. Counsel, F. P. C., also entered an appearance for respondent.

George F. Bruder, Washington, D. C., for intervenor. Thomas M. Debevoise, Washington, D. C., also entered an appearance for intervenor.

Before GEORGE C. EDWARDS, Jr.,* Circuit Judge for the Sixth Circuit, LEVENTHAL, Circuit Judge, and JOHN H. PRATT,** United States District Judge of the United States District Court for the District of Columbia.

LEVENTHAL, Circuit Judge:

These petitions to review[1] attack orders of the Federal Power Commission

---

* Sitting by designation pursuant to 28 U. S.C. § 291(a).

** Sitting by designation pursuant to 28 U. S.C. § 292(a).

1. Petitioners in No. 72–1293 are the Municipal Electric Utility Association of Alabama and twelve of its member utility boards and municipalities. Appearing in No. 72–1294 are the Alabama Electric Cooperative and nine of its associated rural electric distribution cooperatives. Presenting identical issues, the two petitions were consolidated and jointly brief-

which denied motions to reject a rate filing of Alabama Power Company,[2] presented by various of its customers, Alabama municipalities and rural electric cooperatives engaged in the retail distribution of electric power.

At the outset of this controversy, Alabama Power's interstate wholesales of electric energy[3] to Petitioners were made pursuant to 46 individual contracts, providing for delivery at 121 separate locations. These contracts, all negotiated, were filed with the Commission as rate schedules.[4] They contain various and differing terms and conditions of service, and called for deliveries at a fixed price for the duration of the contract. The contracts had various termination dates, ranging from January 3, 1972, to April 17, 1976.[5]

On November 1, 1971, Alabama Power tendered for filing under § 205(d) of the Federal Power Act, 16 U.S.C. § 824d(d), a new tariff schedule applicable to all "electric service provided by Alabama Power Company to municipal distribution systems . . . and rural distribution cooperative . . . ." (R. at 915). In addition to a substantial rate increase over the contract levels, the new tariff embodied a variety of terms and conditions—including automatic tax and fuel cost adjustment provisions—that differed significantly from those of the negotiated contracts. Most important, it placed all wholesale sales on a uniform basis, at a single rate and under identical conditions of service. In place of the individual contracts, all sales were to be made pursuant to service agreements (short form contracts) that incorporated by reference the terms and conditions of the new tariff.

Under the terms of the filing, Alabama Power proposed that the new tariff schedule "became effective January 3, 1972, or the earliest date thereafter *in accordance with existing contracts* with [the affected] customers." (R. at 916, emphasis supplied). The tariff was to be applied to all new service contracted for after the proposed effective date. As to service under existing contracts, however, the new tariff was to become applicable only "as of the date of contractual termination [of service] at [each existing] delivery point." (R. at 917). Hence once outstanding agreements expired, all future service would be rendered under the terms of the proposed tariff. The conversion of municipal and distribution cooperative sales from an individual basis to a single standardized tariff, would become complete in 1976.

On November 15, 1971, the FPC issued a Notice of Proposed Changes in

ed and argued. In this opinion, we refer to the Municipalities and the Cooperatives, collectively, as "the Petitioners."

2. Alabama Power Co., 46 F.P.C. 1386 (1971), reconsideration denied, 47 F.P.C. 280 (1972).

3. Under § 201 of the Federal Power Act, 16 U.S.C. § 824, the "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce" are subject to the Commission's authority.

4. *See* 16 U.S.C. § 824d(c).

5. Eleven of the delivery points (involved in 3 contracts) terminate on January 3, 1972; one delivery point (involved in 1 contract) terminates on February 3, 1972; eleven of the delivery points (involved in 10 contracts) terminate in May 1972; four delivery points (involved in 3 contracts) terminate in July 1972; three delivery points (involved in 1 contract) terminates in August 1972; fifteen delivery points (involved in 1 contract) terminate in November 1972; thirty-three delivery points (involved in 10 contracts) terminate in December 1972; sixteen delivery points (involved in 9 contracts) terminate in 1974; six delivery points (involved in 3 contracts) terminate in 1975; and one delivery point (involved in 1 contract) terminates in 1976. (Petitioners' Br. n. 15 at 14).

Certain of the Municipalities apparently take the position that their contracts were extended to 1980 by various amendments. This issue is not before us, and for purposes of this appeal the parties have agreed to assume arguendo, in order to simplify exposition, that the latest expiration date is April 17, 1976. (*Id.* at 4 and n. 6).

Rates and Charges.[6] Petitioners filed timely intervention petitions, protests, and motions to reject the Alabama Power filing, objecting that the tendered filing: (1) violated § 205 of the Federal Power Act; (2) was premature and in violation of §§ 35.3 and 35.13 of the FPC's Regulations; and (3) violated the Economic Stabilization Act of 1970, as amended.[7]

By order issued December 30, 1971,[8] the Power Commission denied Petitioners' motions to reject the rate filing, granted the petitions to intervene, scheduled hearings to determine whether the proposed rate was just and reasonable, and suspended the effective date of the rate schedule until February 2, 1972.[9] Applications for reconsideration were denied on February 11, 1972.[10]

### A. Matters Relating to Jurisdiction

#### 1. Issues Under Economic Stabilization Act

■ Petitioners raise various contentions that the proposed rate increase was so grossly excessive, and the automatic adjustment provisions so patently contrary to the intent of the Stabilization Act, that the Commission should treat the entire filing as a substantive nullity,[11] and that the FPC's refusal to suspend the rate schedule for five months violated the Price Commission's regulations, § 300.16(i)(3).[12] These are

issues arising under the Economic Stabilization Act, and—to the extent these are currently viable—they are cognizable in the district courts (and, on appeal, the Temporary Emergency Court of Appeals) and not before this court.[13] Municipal Intervenors Group v. FPC, 153 U.S.App.D.C. 373, 473 F.2d 84 (1972).

#### 2. Issues Under Federal Power Act

Petitioners' other contentions, however, arise not under the Economic Stabilization Act but wholly under the Federal Power Act and FPC regulations promulgated thereunder. As to these matters, section 313 of the Federal Power Act mandates: Upon filing of the administrative record, in a pertinent court of appeals, it has exclusive jurisdiction "to affirm, modify, or set aside" the Commission's order on such grounds. See 16 U.S.C. § 825l(b); City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 335–341, 78 S.Ct. 1209, 2 L.Ed.2d 345 (1958).

■ In Municipal Intervenors Group we stated: "The circumstance that utilities are subject to two types of regulatory control raises the possibility of two types of judicial review."[14] While both aspects of the Commission's regulatory jurisdiction are reflected in the order sought to be reviewed, the issues on appeal arising under the Federal Power Act may be cleanly severed from those that require consideration of the Eco-

---

6. Alabama Power Co., —— F.P.C. —— (Docket No. E–7647, Nov. 15, 1971) (R. at 1783).

7. See note to 12 U.S.C. § 1904 (Supp. I, 1970).

8. Alabama Power Co., 46 F.P.C. 1386 (1971).

9. Chairman Nassikas and Commissioner Moody dissented on the ground that the rate should have been suspended for the full five month period permitted by statute. See 16 U.S.C. § 824d(e).

10. Alabama Power Co., 47 F.P.C. 280 (1972) (Chairman Nassikas and Commissioner Moody again dissented.).

11. Citing, inter alia, Municipal Light Boards v. FPC, 146 U.S.App.D.C. 294, 299, 450 F.2d 1341, 1346 (1971), cert.

denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972).

12. 37 Fed.Reg. 652 (1972). This section was deleted except for price increases authorized under law to be placed into effect or legally placed in effect before September 18, 1972. 37 Fed.Reg. 18893 (1972). The current analogous rule is contained in 6 C.F.R. § 300.307(c)(1).

13. In response to our decision in Municipal Intervenors Group, Petitioners instituted separate actions in the District Court to review the Economic Stabilization Act issues arising from the FPC's action. See Baldwin County Elec. Membership Corp. v. Price Comm'n, 481 F.2d 920 (T.E.C.A.1973).

14. 153 U.S.App.D.C. at 379, 473 F.2d at 90.

nomic Stabilization Act.[15] We believe that an entirely harmonious accommodation of the two pertinent Congressional enactments can be achieved by dual review of the Commission's order in both this court and the District Court, each tribunal acting within the sphere of its statutorily defined exclusive jurisdiction. Finding that the exercise of our jurisdiction under section 313 would not constitute an embarrassment to the separate jurisdiction of the District Court of the Economic Stabilization Act, we consider the issues properly cognizable under section 313.

B. *Propriety of the Filing Under Section 205(d)*

■ Petitioners first contend that Alabama Power's filing represents a unilateral attempt to supplant its contractual service obligations and to impose a rate increase not consented to by its customers and in contravention of its agreements with them.[16] Were this the case, the filing could not be accepted under section 205(d),[17] and Alabama Power's only recourse would be to request that the FPC institute proceedings under section 206(a) of the Act,[18] to show that the existing contract rate was so unremunerative as to be affirmatively unlawful. FPC v. Sierra Pacific Power Co., 350 U.S. 348, 76 S.Ct. 368, 100 L. Ed. 388 (1956). *See* United Gas Pipe Line Co. v. Mobile Gas Service Co., 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) (Natural Gas Act).

However, we agree with the FPC's conclusion that the *Sierra* and *Mobile* precedents are inapplicable to the instant case. *Sierra* held that section 205(d) did not permit a supplier to depart from a contract obligation to deliver power at a firm price, absent a contractual novation or an exercise of the Commission's special powers under section 206(a) "to prescribe a change in

15. We have no occasion to consider what sort of accommodation would be necessary in a case where questions reviewable under the Power Act are inseparably interwoven with matters arising under the Economic Stabilization Act.

16. Alabama Power contends that its contracts with the City of Opelika, the Utilities Board of the City of Foley, and the City of Evergreen give it the right to effect unilateral rate increases in the context of the instant proceedings. The Commission did not address itself to these clauses, or whether the pertinent conditions have been satisfied. These questions are within the Commission's primary jurisdiction and cannot properly be considered by this court in the absence of prior FPC consideration. *See* Portsmouth Gas Co. v. FPC, 101 U.S.App. D.C. 99, 247 F.2d 90 (1957). For purposes of this review proceeding, we treat these three contracts as firm price obligations that cannot be altered without mutual consent of the parties.

17. Section 205(d), 16 U.S.C. § 824d(d), provides:
Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

18. Section 206(a), 16 U.S.C. § 824e(a), provides:
Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

contract rates whenever it determines such rates to be unlawful." [19]

In the present case, there is no attempt by Alabama Power to avoid its contract obligations, or to displace or supersede the established rates mid-way during the contracts. Alabama Power's tendered rate schedule was expressly made subject to all outstanding contracts; and the operative date of the rate increases and tariff changes embodied therein is in each instance deferred to the expiration of the existing service contract.

Petitioners also invoke Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960). In *Sunray*, the Supreme Court stressed the statutory requirement of the Natural Gas Act that, in the absence of abandonment proceedings under section 7(b), a natural gas company holding a certificate of public interest and convenience must continue to provide service to its customers, even though its contractual obligations have terminated.[20] Referring to this post-contractual period, the Court observed, 364 U.S. at 155, 80 S.Ct. at 1403:

> The obligation that [the supplier] will be under after the contract term will not be one imposed by the contract but by the Act. [The supplier] will be free then, as it was not free during the contract term under the contract here in question, to make rate changes under § 4 [the Natural Gas Act counterpart to § 205 of the Power Act] without [the purchaser's] consent.

Petitioners read this language to imply that, during the term of the contract, the supplier is wholly disabled from tendering any tariff under section 205, even though the filing will operatively affect rates only during the post-contractual period. This construction,

we feel, distorts the Court's intention, and attempts to draw from its language implications as to an issue neither before the Court nor addressed by it. *Sunray* speaks to the type of filing appropriate to initiate rate changes that are to take effect during the post-contractual period, and intimates no view as to exactly when such a prospective filing may be made.

We agree with the FPC's conclusion that the Federal Power Act does not present any impediment to Alabama Power's filing under section 205(d) of a tariff operative to affect rates for pertinent service only subsequent to expiration of existing service contracts.

C. *Conformity to FPC Regulations*

Section 35.3(a) of the Commission's Regulations, 18 C.F.R. § 35.3(a), provides in pertinent part:

> All rate schedules or any part thereof shall be tendered for filing with the Commission and posted not less than thirty days nor more than ninety days prior to . . . the date on which the filing party proposes to make any change in electric service and/or rate, charge, classification, practice, rule, regulation or contract effective as a change in rate schedule, except as provided in paragraph (b) of this section, or unless a different period of time is permitted by the Commission.

Subsection (b), 18 C.F.R. § 35.3(b), goes on to provide:

> Rate schedules predicated on the construction of new facilities may be tendered for filing and posted no more than 90 days prior to the date set by the parties for the contract to go into effect. The Commission, upon request and for good cause shown, may permit a rate schedule or part thereof to be

---

19. 350 U.S. at 353, 76 S.Ct. at 371.

20. The Federal Power Act contains no counterpart to sections 7(b) and 7(c) of the Natural Gas Act. We need not consider what obligation the Federal Power Act may impose upon a supplier of electric power to continue making interstate wholesale sales after termination of its individual contracts. *Cf.* 16 U.S.C. § 824a(b). Certainly such a supplier of electric power is not subject to constraints greater than those applied to natural gas suppliers.

tendered for filing and posted more than 90 days before it is to become effective.

Petitioners, reading § 35.3(a) in conjunction with the last sentence of § 35.-3(b), argue that Alabama Power's filing, which includes changes that would not take effect until 1976, could not be accepted in the absence of special findings by the FPC of good cause requiring waiver of the "30-90 day" rule.

Subsection (b), which contains an express "good cause" requirement, is addressed to the particularized context of a rate schedule change "predicated on the construction of new facilities." That is inapplicable to the present case.

Section 35.3(a) permits an exception to the 30-90 rule not merely in cases covered by § 35.3(b), but whenever "a different period of time is permitted by the Commission." This reserves to the FPC discretion to accept non-construction-related filing more than 90 days in advance of their effective date.

Whether or not the FPC's discretion has been soundly exercised will, of course, depend on the circumstances of the case as reviewed by the Commission. But we see no reason why a flexible housekeeping measure, designed for the agency's efficiency in internal management, should be cast into a rigid procedural formalism diverting focus from the real issues presented in the filing.

In the matter before us, the basis for relaxing the 90 day rule suffices to justify the FPC's action. Were the 90 day rule applied with full rigor to Alabama Power's 46 contracts with Petitioners, the result would be a plethora of individual filings stretching from 1971 through 1976, each with individual supporting documentation.[21] Differences in timing and the parties would complicate consolidation of proceedings, even though, in the Commission's view, the dominant issue was common to all. Such redundancy is wasteful not only of the time and resources of FPC members and staff,[22] but also of the resources of the parties—costs that must in the last analysis be borne by the consumer.

The single, consolidated proceeding envisioned in Alabama Power's filing mitigates these difficulties. The FPC's rules give ample latitude for the agency to develop and implement innovative methods for the effective dispatch of its functions.[23] We find no abuse of the Commission's discretion in accepting the filing for consideration.

### D. *The Matter of Prematurity*

Having held that the FPC's filing rules interpose no procedural obstacle to the consideration of the tendered filing, we next consider whether its action on the filing was proper. Administrative procedures fail of their fundamental purpose if the goal of expedition is bought at the sacrifice of reasoned decision-making and substantial fairness to the parties concerned. In this context, we consider Petitioners' claim that a present determination of reasonableness—based on a 1970 test year (R. at 962, 1783, 1919)—provides no assurance that the rate so approved will be equally reasonable when applied to customers with late-expiring contracts, say in 1976. In general, rate regulation determinations are based on projections from historical experience to a future effective period, and remain in

21. *See* 18 C.F.R. § 35.13.

22. *Cf.* Permian Basin Area Rate Cases, 390 U.S. 747, 757–758, 88 S.Ct. 1344, 20 L.Ed.2d 312 & nn. 12–15, concerning burden on agency from attempts to regulate natural gas producers on an individual basis.

23. As we said in Municipal Light Boards v. FPC, *supra*, 146 U.S.App.D.C. at 301, 450 F.2d at 1348:

The filing rules at issue here are designed to give the FPC a "first cut" at the material in the filing. They are "mere aids to the exercise of the agency's independent discretion," and in both language and purpose leave room for a doctrine of "substantial" or "reasonable" compliance. American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970).

effect indefinitely, until either the supplier seeks to alter them or the Commission finds them contrary to law under § 206(a). But the question is whether it is reasonable to proceed at the outset by using a recent period to chart schedules to become effective six years hence, and whether the legislative scheme does not contemplate that the proponent of any rate must shoulder a realistic burden of demonstrating its lawfulness, not in some theoretical sense but as it practically affects the parties at the time it is sought to be imposed. Finally, we approach the issue cognizant that, once a tariff has passed the Commission's scrutiny under § 205 of the Act and is made applicable to a particular customer, the likelihood of obtaining a rate reduction or alteration in terms or conditions of service by a proceeding under § 206(a) is indeed remote. Not only would the customer bear the heavy burden of showing the tariff had become unlawful in the period since its approval, but the cost and uncertainty of such proceedings make recourse to them problematical.[24]

Bearing in mind the novelty of the question and the fact that none of the Commission's rules appear to offer firm guidance, we invited the parties to address this larger question of prematurity during oral argument and to file post-argument submissions detailing the steps that must be taken to convert to tariff-based service as each customer's contract expires. From the memoranda, it appears that: "When a customer upon expiration of a fixed rate contract is converted to a filed tariff, a service agreement and amended list of purchasers is [*sic*] to be filed with the Commission."[25] Alabama Power has further assured the court that it intends to file such documentation with the FPC

as each of its individual service contracts with Petitioners expires.[26]

Both the index of purchasers and the service agreement are part of the tariff itself.[27] Additionally, they plainly constitute "rate schedules," a term encompassing "all classifications, rules, regulations or contracts which in any manner affect or relate to . . . service, rates, and charges," as defined in the Commission's Regulations, 18 C.F.R. § 35.2(b)(3). In view of § 205(e) of the Act, we think it inescapable that the filing of "any such new [rate] schedule" gives the Commission authority to inquire into the lawfulness of the rate schedule, to suspend its effectiveness pending such investigation, and, in the case of rate increases, to order the supplier to establish a refund account.

The effect of filing—at the time of conversion from contractual to tariff schedule service—of the necessary amendments to Alabama Power's index of purchasers and the new service agreements will be to afford each affected customer a renewed opportunity to seek FPC review under § 205(e), as contemplated in the Act. In such event, the Commission need not conduct a full-scale proceeding de novo. The FPC could refer back to the proceedings on Alabama Power's general tariff instituted pursuant to the Commission's order of December 30, 1971, and to its determinations therein. Nevertheless, opportunity must be given the customers having late-expiring contracts to call on the utility to show that the assumptions underlying the FPC's earlier determination of the tariff's lawfulness have been validated by experience.

■■ The details of procedural mechanics are best left to the Commission

---

24. *Cf.* Atlantic Ref. Co. v. Public Serv. Comm'n (CATCO), 360 U.S. 378, 389–390, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Sunray Mid-Continent Oil Co. v. FPC, *supra*, 364 U.S. at 144, 80 S.Ct. 1392.

25. Joint Memorandum of FPC & Alabama Power Co., filed Feb. 2, 1973, at 5.

The superseding service agreement also serves as the notice of termination of contractual service required by 16 C.F.R. § 35.15. *Id.* at 6.

26. *Id.* at 7.

27. 18 C.F.R. §§ 35.2 n. 1., 154.34(a), 154.40, 154.41.

in the first instance. In broad outline, however, it appears that FPC review of the Alabama Power filing will proceed as follows: The § 205(e) proceedings that began in early 1972 will include all of Alabama Power's wholesale municipal customers. As to those among the Petitioners whose contracts have already expired, whatever finding the Commission makes as to the lawfulness of the tariff will, of course, be immediately binding. As to those whose contracts remain in effect, such determination will be prospective in nature, and the contract rates and service conditions will remain in effect. When each of these latter contracts expires, Alabama Power will file with the Commission the documentation necessary to bring the affected customer within the terms of the general tariff. At this time, if the Commission has reason to believe that the assumptions underlying its earlier determination are not operative—possibly due to a change in conditions, or more likely a projection of conditions that did not materialize—the Commission may order the § 205(e) proceedings to be reopened; require from Alabama Power whatever additional data is necessary to demonstrate the continuing validity of the tariff rate; if necessary suspend extension of the rate schedule to additional customers; and take whatever further steps may be necessary to assure that the rates and conditions of service remain lawful.[28]

The procedures outlined above do no more than to require continuing agency

---

**28.** The continuing availability of § 205(e) review when transition from contractual to tariff-based service becomes effective disposes of Petitioners' two remaining contentions.

Rule 35.13 of the Commission's Regulations contemplates the filing of various financial and operating data including, *inter alia*, "a statement comparing sales and services and revenues therefrom . . . under both the rate schedule proposed to be superseded or supplemented and the proposed changed rate schedule, each applied to the transactions for the 12 months immediately preceding and to the 12 months immediately succeeding the date on which the new rate schedule is to become effective," and "an analysis of system costs for a test period of twelve consecutive months . . . and an allocation of such costs to the services rendered." (18 C.F.R. §§ 35.13(b)(1), (4)(iii)). The Rule goes on expressly to provide, 18 C.F.R. § 35.13(b)(4)(iii):

Pursuant to application of the filing public utility made at the time of filing of a rate schedule, the Secretary [of the FPC] may allow deviations from the data herein required.

Moreover, these, as well as other filing requirements (see note 23, *supra*, and accompanying text) are subject to:

the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted from the orderly transaction of business before it when in a given case the ends of justice require it."

American Farm Lines v. Black Ball Freight Serv., 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970), quoting N.L.R.B. v. Monsanto Chem. Co., 205 F.2d 763, 764 (8th Cir., 1953). It would be premature for us presently to consider the extent to which either this express exception or the agency's inherent discretion may apply to the documentary support required by Rule 35.13(b). The Commission plainly has ample authority to require sufficient updated financial data to permit an informed judgment as to whether the § 205(e) proceedings should be reopened.

Likewise, the FPC's continuing supervisory role includes authority to suspend implementation of future conversions (and the service agreements by which these are to be effected) for as long as five months to permit review, in accordance with § 205(e). Whether or not such suspensions will be necessary is a matter to be determined in light of the conditions prevailing at the time and, in any event, is a question that lies within the discretion of the Commission. Municipal Light Boards v. FPC, *supra*, 146 U.S. App.D.C. at 302–305, 450 F.2d at 1349–1352. Certainly there was no abuse of that discretion when the FPC rejected Petitioners' request that a prospective order be entered automatically suspending the effectiveness of each future conversion. (Our remarks here are addressed solely to the requirements of the Federal Power Act and import no view as to what the Economic Stabilization Act or the Price Commission's regulations may require.)

supervision of the tariff as its scope is enlarged to include all of Alabama Power's wholesale municipal customers, thus assuring that the regulatory premises upon which approval was based retain their validity as the tariff is applied in practice. They permit maximum benefit to be drawn from the initial, consolidated proceeding. And they represent, in our view, the minimum necessary to assure protection of the statutory rights of those customers with late-expiring contracts.

Subject to these procedures, all of which arise in direct consequence of the sequence of filings detailed in the Commission's memoranda, we find no error in the FPC's denial of Petitioner's motions to reject the filing. The Commission's order to this effect is accordingly

Affirmed.

See also, 152 U.S.App.D.C. 223, 470 F.2d 372.