The CITY OF GROTON and Borough of Jewett City et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Connecticut Light and Power Co., Intervenor.

No. 77–1361.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1978.

Decided Aug. 10, 1978.

Grace Powers Monaco, Washington, D. C., with whom Charles F. Wheatley, Jr., Washington, D. C., was on the brief, for petitioners.

John J. Lahey, Atty., Federal Energy Regulatory Commission, Washington, D. C.,

with whom Robert W. Perdue, Acting Gen. Counsel, and Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on the brief, for respondent.

James R. McIntosh, Hartford, Conn., with whom Richard C. MacKenzie, Manchester, Conn., was on the brief, for intervenor.

Before WRIGHT, Chief Judge, McGOWAN, Circuit Judge and DAVIS,* Associate Judge, United States Court of Claims.

PER CURIAM:

Petitioners, six Connecticut municipal electric utility systems engaged in the retail distribution of electricity, contend that the Federal Power Commission should have rejected a wholesale electric service tariff filed on December 2, 1975 by intervenor Connecticut Light and Power Company.[1] Petitioners contend that the filing did not accurately estimate the impact of the new rate upon themselves, who are wholesale customers of the Company. The essential aggrievement alleged by petitioners, about which they provided no supporting materials either before the Commission or this court, is that the inaccurate estimate by the Company of revenues to be obtained under the new rate adversely affected their capacity to recoup their increased wholesale costs from their retail customers.

Petitioners' initial motion to reject the tariff filing alleged inconsistencies and ambiguities as to the increase in payments they would be required to make under the new tariff. After the Commission denied this motion,[2] accepted the filing, and suspended its effectiveness for two months— until March 2, 1976—petitioners filed several additional motions calling upon the Commission to reject the tariff. The basis for these new requests, filed after the new rate

---

* Sitting by designation pursuant to § 28 U.S.C. § 293(a).

1. Respondent at the time this petition for review was filed was the Federal Power Commission, whose functions have since been transferred by Congress to the newly established Federal Energy Regulatory Commission. In the

remainder of the opinion, respondent will be referred to as "the Commission," and intervenor as "the Company."

2. The Commission accepted the filing on December 31, 1975. Because the motion to reject had the wrong docket number on it, it was not denied until January 8, 1976.

had gone into effect, was that the actual increase in revenue being realized under the new schedule as compared with what would have been obtained had the superseded schedule remained in effect was more than double the increase estimated by the Company in an exhibit filed with the tariff. Petitioners contend that, even if the Commission did not err in initially refusing to reject the new tariff filing, it became obligated to do so when it became apparent that the revenue estimates contained in the filing were substantially inaccurate.[3]

For the reasons explained hereinafter, we find no basis upon which to upset the Commission's orders refusing to reject the tariff filing, either initially or after the disparities in the revenue estimates became known. The Commission's authority to reject is limited, and within those limits is largely discretionary. Moreover, in this case the Commission carefully examined, and fully responded to, petitioners' allegations, and we agree with its conclusion that rejection *nunc pro tunc* of the filing, even if that be within the Commission's power, is not warranted on the record before us.

**3.** Intervenor pressed upon the Commission, as it does upon this court, its view that the Commission does not have authority to reject a tariff after the statutory 30-day notice period has passed, *see* Federal Power Act § 205(d), and the Commission has already accepted the filing and has permitted the new rates to become effective after a brief suspension. Although the Commission has not addressed this issue on appeal, its responses to petitioners' continuing motions to reject the already effective tariff appear to have assumed that it *did* have the authority to reject a tariff filing after the 30-day notice period. While we decline in the present case to resolve this issue, we have noted it because it may recur and be decisive in other cases, and therefore deserves careful consideration by the Commission.

**4.** After the public utility has filed its new rate schedule and supporting exhibits, the Commission may suspend the effectiveness of the new schedule for not more than five months and order a hearing on the justness and reasonableness of the rate change; if after that hearing the tariff rates are determined to be excessive, the Commission may order that refunds be made. 16 U.S.C. § 824d(e) (1970). Under the Commission regulations, the supporting exhibits initially filed by the utility company consti-

# I

At the tariff filing stage, the Commission is authorized to make only a limited determination: whether the proposed tariff is "sufficiently complete for it to be able to decide whether or not to investigate and suspend the increased rate," *Municipal Light Boards v. Federal Power Commission,* 146 U.S.App.D.C. 294, 450 F.2d 1341 (1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972), *sustaining* 18 C.F.R. § 35.5.[4] Federal Power Act § 205(d), 16 U.S.C. § 824d(d) (1970), provides that new tariffs filed with the Commission must "stat[e] plainly the change or changes to be made in the schedule or schedules then in force . . . ." 16 U.S.C. § 824d(d) (1970). The Commission in implementing the provision has required that numerous supporting exhibits accompany the filing of a change in rates, including a comparison of the quantity of service and revenues therefrom obtained under the new and superseded rate schedules, for both the year immediately preceding the rate change and the year immediately succeeding the change.[5] Although the Commission has recently restructured the cost-of-service

tute its *prima facie* case in the subsequent hearing on the justness and reasonableness of the rate, and it is only at the hearing stage that the Commission may inquire into the merits of the rate increase.

This case and *Municipal Light Boards, supra,* involve tariff filings under the Federal Power Act to amend *existing* rate schedules, and a claim that they should not have been permitted to be filed. Compare the recently-decided *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), involving tariff filings under the Interstate Commerce Act to create an *initial* rate schedule, and the issue of the ICC's power to suspend them for investigation.

**5.** 18 C.F.R. § 35.13(b)(1) requires that the utility file

[a] statement comparing sales and services and revenues therefrom, by months and for the year, under both the rate schedule proposed to be superceded or supplemented and the proposed changed rate schedule, each applied to the transactions for the 12 months immediately preceding and to the 12 months immediately succeeding the date on which the new rate schedule is to become effective.

data that must be submitted with the tariff filing,[6] the revenue impact data requirement has not been altered since it was introduced.

 Consistently with the process described above, Commission authority to reject the rate schedule at the filing stage is limited to those filings which are patently defective on their face, *Municipal Light Boards, supra,* at 1346. A reviewing court's ability to require a rejection of a rate filing is even more circumscribed, being limited to a determination of whether the agency acted arbitrarily and capriciously in accepting the filing.

The revenue impact exhibit objected to in the case at bar was not required by the terms of the Federal Power Act,[7] but was submitted pursuant to the filing requirements prescribed by the Commission.[8] Petitioners concede that the exhibit, which contained all required estimates and was over twenty pages in length, was in full "technical" compliance with the specifications in 18 C.F.R. § 35.13(b)(1). They contend, however, the Commission was under an obligation to reject the new tariff because the particular revenue estimates contained in this exhibit were inconsistent with other materials filed with the tariff and because they in fact proved to be inaccurate.

 We have previously expressed the view in that the Commission's filing requirements

are "mere aids to the exercise of the agency's independent discretion," and in both language and purpose leave room for a doctrine of "substantial" or "reasonable" compliance. *American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, [90 S.Ct. 1288, 25 L.Ed.2d 547] (1970).

*Municipal Light Boards, supra,* at 1348. Although that statement was made with particular reference to certain other rules in § 35.13(b), we think that the same principle applies to the revenue comparison requirement at issue here. Thus, passing over for the moment the precise extent and nature of the alleged misrepresentations in the revenue exhibit, the Commission had broad discretion in deciding not to reject the tariff, either at the time of filing or at a later time. Where, as here, the procedural requirements laid out in the Commission's filing regulations were complied with,[9] the Commission certainly cannot be said to have abused its discretion in determining that the filing did not require rejection, *Municipal Light Boards, supra.*[10]

---

6. *See* 38 Fed.Reg. 19965 (1973).

7. The statutory requirement that the utility "state plainly the change" in the rate schedule, Federal Power Act § 205(d), was fully complied with in the initial portion of intervenor's tariff filing, which set out the precise changes in the demand charge and fuel clause formulas applicable to wholesale customers.

8. This court has hereto noted that all filing requirements are subject to
the general principle that "[i]t is always within the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it."
*Municipal Electric Utility Association v. FPC,* 158 U.S.App.D.C. 188, 196 n. 28, 485 F.2d 967, 975 n. 28 (1973), *quoting American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 539, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). It was not necessary in the foregoing case, *see* 485 F.2d at 975 n. 28, and is not necessary in this case, to determine whether and to what extent

this principle applies to the revenue comparisons required by § 35.13(b)(1).

9. The only document filed which did not fully comport with Commission requirements was the proposed Federal Register notice of the new tariff, *see* note 12 *infra.*

10. This is not to say that patent defects or inaccuracies in the revenue comparison exhibit or similar exhibits required by the Commission's filing rules can never warrant rejection of a tariff filing. In sustaining the Commission's action in this case, we do not decide whether the Commission correctly delineated its authority to reject when it stated that "[f]ailure to specify the impact on customers . . . is not a reason for rejection of a filing," *Denial of Petition for Reconsideration* (Jan. 20, 1976), R. 449. Of course, even if the data submission requirement at issue in this case is intended to provide notice to electric utility customers of the revenue impact of a rate change, the Commission still retains broad discretion to determine whether such notice has been sufficiently

## II

While the foregoing considerations demonstrate the propriety of the Commission's actions, we think it significant that the Commission did not peremptorily exercise its discretion to refuse rejection. Rather, it carefully and repeatedly examined and responded to petitioners' allegations of defect. Such examination reveals that the particular inaccuracies in this case were not substantial and did not constitute a purposeful or egregious failure to comply with § 35.-13(b)(1) of the Commission's filing requirements.

### A.

The revenue comparisons required by § 35.13(b)(1) of the Commission's regulations were contained in exhibit B–8 of intervenor's tariff, filed on December 2, 1975. The data were broken down for each wholesale customer, showing in the aggregate that for the first twelve months of operations under the new rate (called the "R–3" Rate), approximately $30 million would be collected from the customers, while this same amount of service would produce approximately $25 million if the superseded rate (the "R–2" rate) were to remain in effect. In its Federal Register notice of the tariff change, the Commission stated both the absolute revenue increase, $5 million, and the percentage increase, approximately 20%, that this represented. It is evident that the Commission computed the figures in its notice directly from intervenor's B–8 exhibit;[11] there is no provision nor any reason for the Commission at the tariff filing stage to estimate the increase in revenues on the basis of its own analysis of the new and old rate formulae.

Petitioners' first allegation of defect in intervenor's filing is that the $5 million, or 20%, increase contained in the B–8 exhibit

is inconsistent with other statements in the tariff filing. It is asserted that intervenor's Letter of Transmittal and the proposed Federal Register notice submitted with the tariff indicated that the increase in revenues due to the shift from the R–2 to the R–3 tariff would be approximately 10%. This contention is devoid of merit. As the tariff filing makes abundantly clear the aggregate estimated increase in revenues of $5 million resulted from two separate changes in the rate schedule. First, the R–3 rate contained a different fuel adjustment clause structure, as required by Commission Order No. 517 (1973), 18 C.F.R. § 35.14. This new—and Commission-mandated—fuel clause allowed greater recovery of costs with respect to nuclear fuel and net interchange transactions than did the fuel clause contained in the R–2 rate. Second, the R–3 rate included an increase in the demand charge for electric service. The Letter of Transmittal and the proposed Federal Register notice submitted by intervenor with its tariff filing included a summary estimate of the increase in revenue due solely to the latter change, apart from the increase in revenues that would occur as a result of use of the new fuel clause required by the Commission. The estimate was that this portion of the increase in revenue would be approximately $2.5 million, or an increase of 10%.

While it might have been more helpful for the Company to have included in the Letter of Transmittal its estimate of the total increase in revenues it would obtain under the R–3 rate, including that resulting from the change in the fuel clause, it was not required to do so. It did include this aggregate estimate, as required, in its B–8 exhibit; and numerous other supporting documents explained with clarity that two sources of revenue increase were involved in the R–3 rate tariff.[12]

---

provided. Moreover, it is clear that, because they are necessarily predictions only, the revenue estimates required by § 35.13(b)(1) can seldom, if ever, be precisely accurate.

11. The B–8 exhibit referred only to dollar amounts and thus did not actually contain the 20% figure.

12. Under Commission regulations, the proposed Federal Register notice also should have contained an estimate of the total increase sought, see 18 C.F.R. § 35.8(a); that the Commission included this estimate in the notice it actually published is further evidence that it was clearly noted in the tariff filing.

### B.

Petitioners' second allegation of defect in the tariff filing is that it misrepresented both the absolute and the percentage increases in revenue the Company would collect under the new rate. In the B–8 exhibit, the Company, given certain assumptions about consumer demand and the mix of fuel sources, projected that in 1976 the new tariff would boost its revenues by 20%, from approximately $25 million under the R–2 rate to $30 million under the R–3 rate. The Company's actual revenues for 1976, however, reveal that if the rate change had been in effect for the entire year, the Company would have added to its revenues by more than 40%, from approximately $17 million under the R–2 rate to $25 million under the R–3 rate. The discrepancies between these projected and actual revenue figures are the nub of petitioners' second alleged defect in the tariff application.

These discrepancies apparently stem from errors in two assumptions used to compute the B–8 projections. The first error, as examination of the B–8 exhibit would have revealed and as the Company later explained to the Commission, was an inflated estimate of petitioners' demand for service in 1976. The inflated estimate of demand, provided to the Company by *petitioners*, resulted in an overestimate of 1976 revenues under both the superseded and new rate schedules.

The second error, which pertained to assumptions about the Company's fuel mix, had an asymmetrical impact on the B–8 projections (for reasons explained hereinafter), inflating only the projected 1976 revenue under the old R–2 rates. Because the R–2 figure in the B–8 exhibit was even more overestimated than was the R–3 figure, the actual percentage differential between the revenues obtained under R–3 and what would have been obtained under R–2 was greater due to another source of error, namely, the operation of the new, R–3, fuel clause. Because this clause allowed greater recovery of nuclear costs and interchange purchases than did the clause contained in the R–2 rate, the precise differential between revenues that would be obtained under each rate was dependent on the mix of fuel sources utilized by the Company to produce electricity. If the mix included more nuclear and interchange operations than had been contemplated, then the actual differential between revenues obtained under the R–2 and R–3 rates would be greater than the estimated differential based on a different contemplated fuel mix. This is apparently what happened in this case. Because the Company had greater success than it had expected to have with a nuclear generating facility that began operating at the beginning of 1976, it evidently purchased more nuclear fuel than it had planned to when it constructed the revenue estimates in its B–8 filing. Thus, if the R–2 rate had continued in effect, it would have resulted in less revenue than had been estimated, since the fuel clause contained therein did not allow as full recovery of nuclear fuel costs as it did of other fuels.

The foregoing explanation, which was set out by the Commission in various of its denials of petitioners' motions to reject, refutes petitioners' contentions that the Company's B–8 exhibit *under* estimated the true impact of its new tariff. Before both the Commission and this court, petitioners have repeatedly focussed on the fact that the actual percentage *differential* between R–2 and R–3 revenues (42%) was greater than the estimate thereof in the B–8 exhibit (20%). However, as noted by the Commission, see Record at 1028, such a differential comparison conveniently ignores the significant fact that the actual total amount of revenues collected under the new rate, R–3, turned out to be less than had been estimated. And, as has been explained, the overriding reason for this overestimation was that the *petitioners* had overestimated their demand for electric service in 1976.

Further, as the Company noted both in its original filing and in its response to petitioners' motions to reject, the change in the fuel clause formula made comparison of the amount of revenue collected under the R–3 rate with the amount of revenue that would have been obtained under the R–2

rate—the differential (whether expressed in absolute dollars or percentage terms) on which petitioners' claim is based—misleading and meaningless. *See* Record at 3–4, 23–33, 432–37. One reason for this is that comparison of revenues under R–2 and R–3 assumes that the fuel mix actually used under the R–3 rate would also have been used had the R–2 rate remained in effect. But it seems to us that if the R–2 rate in fact had remained in effect throughout 1976, the Company would not have used the particular fuel mix it used with the R–3 rate in effect—with its heavy reliance on nuclear fuels—because the R–2 fuel clause did not allow as full recovery of the cost of such fuels. Thus, any dollar figure for R–2 revenues in 1976 is meaningless, as are differential figures derived therefrom.

### III

█ Although, as explained above, the primary purpose of the Commission's filing requirements is to aid the decisionmaking process of the Commission, the filing of a new tariff, with supporting documentation, also functions as notice to the public and to a utility's customers of pending rate changes. This function is reflected in the Federal Power Act's thirty-day notice provisions,[13] and has been recognized by the Commission in specifying its filing requirements.[14] Thus, even though the Commission's discretion to reject a rate filing is limited, it has the authority to structure its filing requirements so as to afford as meaningful notice as possible to a utility's customers and to avoid the possibility of detrimental reliance upon inaccurate filing submissions. We have significant doubts that the particular inaccuracies involved in this case could have been relied on to the detriment of petitioners, but believe that the broader issue of inaccuracy in revenue estimates may deserve the further attention of the Commission. Our concern is flagged particularly by intervenor's contention that

inaccurate estimation of revenue differentials under the new and the superseded rates could not have been avoided, and indeed can be expected to occur in the future due to the complexities of fuel clauses and other rate formulae. If indeed electric utility customers have been relying on these estimates, then it is important to structure them so as to minimize inaccuracy.

Petitioners did not explain at any stage of the proceedings before the Commission how the inaccuracies in the R–2 and R–3 estimates contained in the B–8 exhibit caused them harm. However, in their reply brief and at oral argument petitioners have suggested, without ever explicitly stating that they used such a procedure, that in order to pass on an increase in the rates charged them, wholesale customers may simply apply a surcharge to the existing rates they charge their retail customers, and that this surcharge is the percentage differential estimate that proved to be inaccurate in this case. Thus, it is suggested, the inaccurate revenue estimates either were or could have been detrimentally relied upon. In response at oral argument, intervenor expressed great skepticism as to whether any utility company would use such a procedure to set its retail rates.

It is obviously not within the province of this court to determine to what extent utility customers should or do rely on revenue estimates contained in tariff filings. The Commission, however, has the expertise and authority to make this determination. A useful preliminary inquiry would not be directed solely to whether customers rely on that revenue differential and the related percentage figure that have been challenged by petitioners in this case. It may be, for instance, that customers rely generally on the absolute amount of revenue, rather than the change in revenue, that it is estimated will be collected from them, a figure which also may be inaccurate, as it proved to be in this case.

---

**13.** Federal Power Act § 205(d), 16 U.S.C. § 824d(d) (1970).

**14.** *See* 38 Fed.Reg. at 19967 (1973). Recognizing this notice function does not imply that

either customers or the public have an enforceable right "to insist on adherence" to filing requirements, *Municipal Light Boards, supra,* at 1354.

Intervenor indicated both before the Commission and in its brief to this court that it would have been impossible for it to estimate future revenues with precision, and that this is due particularly to the complexity of the fuel clauses that the Commission has mandated be used. *If* indeed these estimates must be relied on by wholesale customers in setting their rates, then the Commission may want to consider further action, such as requiring that a disclaimer be noted with respect to such estimates, as in fact intervenor in the case at bar did make in the testimonial submission filed with its tariff. Alternatively, the Commission might require comparison of kilowatt per hour charges, rather than actual revenues, under the old and new rates, since the former comparison is not dependent on possibly erroneous estimates of customer demand for electricity service. The Commission may even want to consider restructuring its revenue comparison requirements to parallel its recently restructured cost comparison requirements, *see* note 6 *supra*.[15] We note that the latter requirements ("Statement L—Overall cost of service") includes a twelve month ("Period II") estimate of the revenue to be collected under the new tariff, just as does the revenue comparison at issue in the present case (although the months on which the Period II estimate is based need not be the same as those used for the revenue comparison under § 35.13(b)(1) ). *See* § 35.13(b)(4)(iii). Rather than compare the Period II revenue figure with the revenue that would be obtained for the same period under the old rate were it to remain in effect, however, Statement L compares this figure with the revenue actually collected during the preceding twelve months ("Period I"). It may be that this revenue comparison is more useful than is that required by § 35.13(b)(1).

We intimate no hypotheses as to what a modest preliminary inquiry into the accuracy of and extent of reliance on revenue estimates would reveal or whether it would disclose a need for further Commission action. It may be that under the new fuel clause formula required by the Commission, which does not contain a bias for certain fuels over others, there exists no problem of substantial inaccuracy; or that such inaccuracy as exists cannot be avoided; or that wholesale customers do not even rely on revenue estimates in tariff filings because their own fuel clauses automatically reflect increases in the cost of fuel to them. The depth and amount of effort devoted to any Commission inquiry into the problem of inaccuracy in revenue estimates obviously depends on the seriousness of the problem, a determination that at this stage is peculiarly within the province of the Commission itself.

*Affirmed.*

---

**15.** We are aware, however, that the Commission has already at least once considered and rejected a similar proposal, *see* 38 Fed.Reg. at 19966 (1973).