652 F.2d 136
 209 U.S.App.D.C. 143
 WESTERN UNION INTERNATIONAL, INC., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Western Union Telegraph Company, TRT Telecommunications
Corporation, RCA Global Communications, Intervenors.
The WESTERN UNION TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
TRT Telecommunications Corporation, Intervenor.
 Nos. 78-1697, 78-2024.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 8, 1980.
Decided Nov. 18, 1980.
 
 H. Richard Juhnke, with whom Joel Yohalem, Jack Werner, and Melvin Richter, Washington, D.C., were on brief, for The Western Union Telegraph Company, petitioner in No. 78-2024 and intervenor in No. 78-1697.
 Alvin K. Hellerstein, New York City, with whom Michael H. Mobbs, Robert E. Conn, and Robert Michelson, New York City, were on brief, for Western Union International, Inc., petitioner in No. 78-1697. John M. Gibbons, Washington, D.C., also entered an appearance for Western Union International, Inc.
 E. Edward Bruce, Washington, D.C., with whom William P. Mayer, Washington, D.C., was on brief, for intervenor TRT Telecommunications Corp. William P. Skinner, Washington, D.C., also entered an appearance for intervenor TRT Telecommunications Corp.
 Alan Y. Naftalin and Gregory C. Staple, Washington, D.C., were on brief, for intervenor RCA Global Communications, Inc., in No. 78-2024. William F. Taylor, Wilmington, Del., also entered an appearance for intervenor RCA Global Communications, Inc.
 John E. Ingle, Asst. Gen. Counsel, F.C.C., Washington, D.C., with whom Robert R. Bruce, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Washington, D.C., were on brief, for respondents. C. Grey Pash, Jr., Counsel, F.C.C., and Barry Grossman and Ron M. Landsman, Attys., U.S. Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Before TAMM, ROBB and MIKVA, Circuit Judges.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 In these consolidated appeals Western Union Telegraph Co. (WU) and Western Union International, Inc. (WUInt) challenge orders[1] by the Federal Communications Commission (Commission) regarding a 1977 tariff filing by WU for services it renders in the provision of international telex and TWX service. In its order of May 25, 1978, the Commission rejected those parts of the tariffs proposing charges for "outbound" messages, but refused to reject those portions relating to charges for "inbound" traffic.[2] The Commission held that WU's tariff filing for services provided in the transmission of outbound messages had not been published pursuant to the mutual agreement of the carriers required by section 222(e)(1) of the Federal Communications Act.[3] The filing, it concluded, was therefore in clear conflict with the statute and must be rejected. The Commission found no similar patent invalidity in the tariff establishing inbound rates and accordingly refused to reject it. In its petition WUInt seeks reversal of this refusal to reject the tariff establishing inbound rates; WU petitions for reversal of the Commission's rejection of its outbound tariff. For reasons hereinafter discussed, we dismiss both petitions without prejudice.
 
 I. BACKGROUND
 
 2
 A. Telex, TWX, and the Nature of International Communications Interconnection
 
 
 3
 Telex and TWX services enable subscribers to communicate with each other in record (written) form by means of teletypewriters.[4] WU handles communications made within the continental United States, while international record carriers (IRCs) such as WUInt service international traffic. These IRCs send and receive messages from five gateway cities.[5] Outbound communications are transmitted from a gateway city to a foreign interconnection point where they are then routed by the foreign telecommunications administration to the desired destination. Inbound messages are transmitted from the foreign interconnection point to the appropriate gateway city. Because the IRCs are permitted to operate only in these designated cities, however, customers in other areas who wish to send or receive overseas communications require additional service. WU provides this additional service by transmitting these messages to and from the gateway city.
 
 
 4
 Charges for the transmission of inbound international communications are established by the overseas administration, while those for outbound communications are established by the IRC. These charges represent a joint rate for the complete transmission of overseas communications traffic. This rate is first divided between the IRC and the proper foreign administration pursuant to an agreement. From its portion the IRC then compensates WU for the services it provides in transmitting the domestic portion of the message to or from the customer. As with the foreign administration, this division of charges has been, until recent years, a matter of agreement between the parties. Western Union Telegraph Co., 68 F.C.C.2d 98, 99 (1978).
 
 B. WU and the IRCs: The Historical Context
 
 5
 WU first entered into contracts for interconnected service with the IRCs when it initiated domestic telex service in 1961.[6] Under these contracts the IRCs agreed to pay WU an amount equivalent to that charged any public subscriber to WU's telex service. With regard to TWX service, however, charges were governed by contracts between American Telephone & Telegraph Company and the IRCs which WU had adopted when it purchased the TWX system. Under these contracts the IRCs received a discount from the rates charged WU's public subscribers.[7] In 1973 these contracts expired, and WU notified the IRCs that further services would be provided only at the rates charged regular domestic subscribers. The IRCs refused to pay the new charges, claiming that WU could not increase unilaterally its share of the international charges. WU thereafter sought to compel payment,[8] but the dispute was ultimately settled through agreements reached between WU and the IRCs in 1975 and 1976.[9]
 
 
 6
 Under these 1975-1976 settlement agreements covering both telex and TWX service, the IRCs agreed to pay most of the arrearages previously withheld. In return, WU agreed to grant the IRCs a five and one-half percent discount from the rates charged its public domestic customers. This provision explicitly superseded the prior agreements between WU and the IRCs with regard to rates, and was to be effective until December 31, 1977.[10]
 
 C. The Present Dispute
 
 7
 On December 2, 1977 WU filed revisions to its domestic telex and TWX tariffs with the Commission. At the same time it filed tariffs modifying the rates charged for the telex services provided the IRCs. These new rates effectively eliminated the contractual discount previously accorded the IRCs and subjected them to the same charges paid by other subscribers for domestic telex service. The IRCs opposed the new tariffs, claiming that the filings represented an unlawful attempt to terminate valid contracts existing between the IRCs and WU, and that this unilateral action violated the requirement of section 222(e) that division of charges be accomplished by agreement between the IRCs and WU or, failing agreement, by prescription of the Commission.[11] Citing these objections, the IRCs filed petitions with the Commission requesting it to reject the tariffs or, alternatively, to suspend and investigate them.
 
 
 8
 The Commission acceded in part to that request. By its order of May 25, 1978, it rejected that portion of WU's tariff filing purporting to change the rates charged for outbound messages. Western Union Telegraph Co., 68 F.C.C.2d 98 (1978). In reaching this conclusion, the Commission first found that the submission of filings by WU did not constitute the abrogation of "presently effective, lawful contracts" between the IRCs and WU. Id. at 110. It held that the 1975-1976 settlement agreements expressly superseded previous agreements as to charges, and that the charges specified in the settlement agreements were not intended by the parties to be effective beyond December 31, 1977. It thus concluded that since no other provision had been made for rates after that date, and since there existed no express prohibition in the agreements against the mere use of a tariff by WU, the tariff filings could not be said to conflict with existing intercarrier contracts. Rejection was therefore not warranted on this ground. Id. at 111-12.
 
 
 9
 The Commission did determine, however, that rejection of the tariff was required by section 222(e)(1) of the Act. In the Commission's opinion, that section imposes an affirmative obligation upon WU and the IRCs "to attempt to agree on a reasonable division of charges formula for outbound overseas traffic." Id. at 113. If such an agreement cannot be reached, the Commission is authorized to prescribe, "after due notice and hearing," a formula it finds to be "just, reasonable, equitable, and in the public interest." Id. The Commission found nothing in the materials offered for its consideration permitting it to conclude either that the rates published by WU had been determined "pursuant to a mutually agreed to division of charges formula," or that the parties had agreed to "divide future outbound charges in accordance with rates set exclusively at the initiative of WU." Id. Thus, it "ha(d) no alternative" but to hold that the tariffs clearly violated section 222(e) of the Federal Communications Act and must be rejected for that reason.[12]
 
 
 10
 With regard to the charges for inbound traffic, on the other hand, the Commission found no similar patent defects. It held that the procedures in section 222(e) are inapplicable to the establishing of charges for inbound communications; instead, section 201(a) is the controlling provision.[13] In that section the Commission found no express specification of the methods by which charges are to be divided between WU and the IRCs, only a general requirement that "connecting carriers ... establish divisions of charges for through routes in accordance with orders of the Commission, after opportunity for hearing ...." Id. at 114. On that basis the Commission concluded that tariff publication was a permissible method by which this division of charges could be accomplished, and that therefore WU's tariff could not be rejected for "patent unlawfulness."[14]
 
 
 11
 The Commission did find, however, that, like WU's tariff revisions for its public domestic subscribers, see Western Union Telegraph Co., 67 F.C.C.2d 1420 (1978), these inbound rates raised substantial questions of lawfulness regarding the resulting rate of return. It therefore suspended the rates for the full statutory period[15] and set them for investigation in CC Docket No. 78-97, previously established by the Commission for the investigation of WU's public domestic tariffs. Western Union Telegraph Co., 67 F.C.C.2d 1420 (1978). By thus enlarging the scope of CC Docket No. 78-97, the Commission believed it could resolve more efficiently the common question of an excessive rate of return. Western Union Telegraph Co., 68 F.C.C.2d at 119. More importantly, however, the Commission also determined to investigate thoroughly the basic issue underlying the chronic disputes between the IRCs and WU, namely, the right of the IRCs to a discount from the charges established for public domestic customers. In the course of such an investigation, the Commission stated, it would "make several observations concerning section 222(e)(1)," and comment on the appropriate methods for fulfilling the purposes of that section. Id. at 121. It would also undertake to "prescribe a single division of charges formula encompassing both inbound and outbound IRC Telex and TWX traffic to restore order to the WU-IRC relationship, as well as to eliminate any unlawfulness under Sections 201 and 202 of the Act." Id. at 122-23.
 
 D. Subsequent Events
 
 12
 Following the release of this order, WU and WUInt filed the present petitions in this court.[16] At the same time, however, WU and the IRCs pursued the prospect of settlement, and in January 1979 concluded short-term agreements. Under these proposed contracts the IRCs were to pay for WU's services at a rate six percent below that charged public domestic subscribers under the domestic tariff which became effective on August 10, 1978. This discount was to continue for a two-year period from January 1, 1978, through December 31, 1979. Thereafter, either party was free to terminate the agreement upon sixty days' notice. In addition, the contracts also provided for future negotiations regarding the revision of other substantive matters covered in the earlier agreements. Western Union Telegraph Co., 71 F.C.C.2d 621, 623 (1979), petition for review dismissed sub nom. Western Union Int'l v. FCC, No. 79-1632 (D.C.Cir. Sept. 10, 1979).
 
 
 13
 The Commission, however, refused to approve the agreements. Stating that such approval depended upon "the extent to which the proposed settlement obviates the need for investigation of the factual, legal, economic, or policy matters originally set for investigation and whether the terms of the settlement are in the public interest," id. at 627, the Commission found the proposed agreement deficient in both respects. It was particularly concerned that the rate schedules established in the agreements would unduly favor the IRCs over the public domestic customers using the same services. It also found potential for substantially greater disparity in the fact that rates were established in absolute numerical terms rather than embodied in a formula through which subsequent adjustments could be made. Moreover, the Commission remained skeptical that the proposed agreements offered any promise of a lasting solution to the underlying problems. Therefore, although it urged the parties "to attempt to arrive at a mutually acceptable interim arrangement," id. at 630, the Commission found that the agreements before it did not adequately serve the public interest, and accordingly denied the parties' Joint Motion to Accept or Approve Agreements and Delete Issues. In addition, it reiterated its determination to prescribe interim outbound charges in the event that future negotiations failed to produce a satisfactory arrangement and delegated the necessary authority to the administrative law judge (ALJ) presiding over CC Docket No. 78-97. Id. at 630 n.14.
 
 
 14
 Subsequent attempts by WU and the IRCs to reach an appropriate agreement proved fruitless. After reviewing the recommendations of the parties, the ALJ concluded that circumstances indicated the desirability of interim prescription of outbound rates. Western Union Telegraph Co. (Memorandum Opinion and Order Prescribing Interim Division of Charges), FCC 79M-845 (July 24, 1979). Finding no "persuasive showing" of a significant differential between the costs of services provided the IRCs and those incurred in the servicing of public domestic customers, the ALJ prescribed an interim division of charges which eliminated the discount previously allowed the IRCs. FCC 79M-845 at 3. At the same time he recognized that the parity thus established between inbound and outbound charges might result in the receipt by WU of revenues higher than those which the Commission might ultimately prescribe. He therefore made the increase subject to a possible future refund. Id. at 8.
 
 II. DISCUSSION
 A. Petition of Western Union International
 
 15
 WUInt challenges the Commission's refusal to reject WU's tariff for inbound traffic. WUInt contends that WU has no right to file a tariff in which it establishes unilaterally its share of the charges for inbound international telex services. Before addressing that contention, however, we must first determine whether review of the Commission's order is appropriate at this time.
 
 
 16
 The Commission argues that WUInt's petition is premature because the lawfulness of the rates established by WU in its inbound tariff is currently under investigation in CC Docket No. 78-97. That proceeding, according to the Commission, affords petitioner the opportunity to obtain any relief to which it is entitled. More specifically, if the Commission concludes from its investigation that the rates presently in effect are unlawful, WUInt's remedy is the refund of any portion deemed to have been wrongfully paid. Since WU is presently subject to an accounting order, such a refund could be readily accomplished by Commission order. The Commission also notes that WUInt will have an opportunity in CC Docket No. 78-97 to present its allegations regarding the lawfulness of the inbound tariff. For these reasons, it argues, this court's reversal offers petitioner no benefit sufficient to warrant immediate judicial intervention.
 
 
 17
 WUInt claims, on the other hand, that the only issue it brings to this court is whether WU has the right to file a tariff representing a unilateral determination of its share of the charges for inbound international telex service. It states that this right was upheld by the Commission and reaffirmed in that agency's denial of reconsideration. It notes that the power to review an agency's refusal to reject a tariff where the law does not permit the tariff to be filed is clear, and argues that the Commission's order, although not the last decision in the proceeding, is a final determination that Western Union may order its relationship with the IRCs by the filing of tariffs for inbound telex service. Accordingly, WUInt contends, the Commission's decision is immediately reviewable.
 
 
 18
 In appraising the respective contentions of the parties, we begin with the proposition that our jurisdiction is restricted to a review of "final orders of the Federal Communications Commission ...." 28 U.S.C. § 2342(1). This finality requirement "reflect(s) the reasoned policy judgment that the judicial and administrative processes should proceed with a minimum of interruption." Community Broadcasting of Boston, Inc. v. FCC, 546 F.2d 1022, 1024 (D.C.Cir.1976) (footnote omitted). Correspondingly, it accords proper deference to the role of the agency in the administrative scheme and a concern for the efficient utilization of judicial resources.
 
 
 19
 In the context of a rate proceeding, these principles and policies of finality indicate that "(t)he quintessential reviewable order"[17] is a determination by the Commission regarding the justness and reasonableness of the proposed rates. As this court recently stated in Papago Tribal Utility Authority v. FERC,[18] 628 F.2d 235 at 239 (D.C.Cir.1980), cert denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980): "(s)uch a determination, generally made after a lengthy hearing during which all relevant legal and factual questions are aired, disposes of all significant disputed issues in the case on their merits and fixes the obligations of the parties." By contrast, the refusal to reject a filing "is analogous to the denial of a motion to dismiss under the rules of civil procedure ...." Id. Acceptance of a tariff by an agency marks only the initiation of a proceeding in which the Commission might resolve satisfactorily all the claims of the parties. On the other hand, new issues may arise in that proceeding which also merit appellate review. Intervention at the acceptance stage would thus be a waste of judicial resources absent some showing of irreparable injury requiring immediate review.[19]
 
 
 20
 We believe that the policies discussed by the Papago court are relevant to a consideration of the unique factual circumstances before us. In CC Docket No. 78-97, the Commission has established a comprehensive proceeding. It seeks to assess in that proceeding the lawfulness of the inbound rates pursuant to sections 201-205 of the Act.[20] More importantly, however, the Commission will also attempt to reach the heart of the controversy which has brought WU and the IRCs before the Commission and the courts on so many occasions: the question of whether the difference between costs incurred for services provided the IRCs and those incurred for services provided public domestic customers is sufficient to justify a discount in the rates charged the IRCs. Western Union Telegraph Co., 68 F.C.C.2d at 122. In the resolution of this controversy, the Commission has stated that it will make several observations about section 222(e)(1) and about the history of the contracts governing the relationship between the parties. Additionally, the Commission has professed its belief that a prescription of "a single division of charges formula encompassing both inbound and outbound IRC Telex and TWX traffic" is warranted. Id. at 121-22. Through these actions the Commission will attempt to "restore order to the WU-IRC relationship," id. at 123, thereby reducing the instability in the present operating climate and the consequent potential for impairing the provision of overseas service.
 
 
 21
 We see no benefit to be derived from judicial interruption of this undertaking. The proceeding in CC Docket No. 78-97 will result in a final disposition by the Commission of all the issues regarding the lawfulness of WU's inbound tariff filing. The Commission will be able to develop fully its interpretation of the scope of section 222(e) and the significance of that section for future international interconnection relationships. It will also have the opportunity to adjudicate the justness and reasonableness of the present rates under sections 201 and 202.[21] On the other hand, WUInt will have a forum in which to present the allegations it now sets before this court. WUInt may also receive the relief it claims is required by section 222(e) the prescription of inbound rates by the Commission. See Brief of Petitioner WUInt at 13. Thus, WUInt may determine that further appeal to this court is unnecessary.
 
 
 22
 If the proceeding ultimately fails to afford WUInt complete satisfaction, WUInt may then seek appellate review. If successful, it may recover any sums it has unlawfully paid. WUInt will suffer no harm from this delay in recovery since WU is currently subject to an accounting and refund order. Western Union Telegraph Co., 69 F.C.C.2d 930 n.14. Moreover, review at that stage will be facilitated by a full record developed by the Commission in a comprehensive proceeding. We will have before us not only the observations of the Commission concerning the scope of section 222(e) and its determination concerning the reasonableness of the effective rates, but also the administrative solution it has fashioned to remedy the longstanding controversy between WU and the IRCs. An appeal presented in this context will result in a more knowledgeable, and thus equitable, review.
 
 
 23
 In short, a realistic appraisal of the Commission's order and of all pertinent interests leads us to conclude that review at this time would be premature. First, despite WUInt's claim that the Commission has finally "fix(ed) the IRCs' legal relationship with Western Union," Reply Brief for Petitioner WUInt at 4, we believe that the Commission will make its final determinations regarding the appropriate structure of the WU-IRC relationship only at the conclusion of its proceeding in CC Docket No. 78-97. Second, as we have indicated above, intervention at this stage could very possibly result in the waste of judicial resources. Finally, the public interest which the Commission is obligated by statute to serve could only benefit by a more permanent resolution of the recurring problems which threaten to interrupt the flow of international telex and TWX services.[22]
 
 B. Western Union's Petition
 
 24
 WU alleges that the Commission erroneously rejected its outbound tariff. WU claims that this rejection was based on the Commission's misinterpretation of the applicability of section 222(e)(1).[23] It further argues that even if section 222(e)(1) does govern its relationship with the IRCs, the agreement required by that section is manifested in the 1975-1976 settlement agreements. On either of these bases, WU contends, this court may reverse the Commission's rejection of its outbound tariff.
 
 
 25
 Before we reach these contentions, however, we must again determine whether review at this time is appropriate. At the outset we note that this court has recently reaffirmed the concept that orders rejecting rate filings are "genuinely final orders, disposing of all the issues in the case, and have been uniformly treated as immediately reviewable." Papago, 628 F.2d at 241 n.16, slip op. at 12 n.16. We believe, however, that the Commission's determination to reject WU's outbound tariff does not fit easily within that concept.[24] The present circumstances evidence a unique situation. The Commission has not simply rejected the tariff; it has determined that the current disorder in the IRC-WU relationship merits more comprehensive attention. We therefore conclude that the equities which led us to dismiss WUInt's petition must control the disposition of WU's petition as well. In so concluding, we reiterate the importance of the Commission's creation of a more permanent framework in which a comfortable working relationship between the IRCs and WU may be established. Additionally, we note that in the Commission's proceeding the question of the scope of section 222(e) and the applicability of its subdivisions to inbound and outbound tariffs will be explored. Not only will WU have an opportunity at that time to present again its contentions before the Commission, but the Commission's discussion of the matter will also provide a more complete record for review of questions arising from its conclusions. Finally, we believe WU will sustain no injury as a result of our action. The interim outbound charges established by the ALJ are equal to the rates proposed by WU in its tariff. These rates continue in effect until a permanent prescription is made by the Commission in CC Docket No. 78-97. If dissatisfied with this prescription, WU may appeal the Commission's determination to this court. At that time WU may also assert its claims for any restitutionary relief to which it believes it is entitled.[25]
 
 III. CONCLUSION
 
 26
 In CC Docket No. 78-97, the Commission seeks an objective of ambitious character and comprehensive scope. We find no sound basis for our intervention at this time. Indeed, respect for an agency's expertise in fulfilling its statutory duties and considerations of efficiency in the allocation of judicial resources support our decision to defer review. Accordingly, the petitions of Western Union and Western Union International are
 
 
 27
 Dismissed.
 
 
 
 [1]
 Petitioners request review of Western Union Telegraph Co., 68 F.C.C.2d 98 (1978), a memorandum opinion and order adopted May 9 and released May 25, 1978, in which the Commission originally made the rulings here challenged; and Western Union Telegraph Co., 69 F.C.C.2d 924 (1978), in which the Commission denied the parties' petitions for reconsideration of its first order
 
 
 [2]
 "Outbound" refers to those messages transmitted from the continental United States to a foreign interconnection point. "Inbound" refers to those communications transmitted from a foreign telecommunications point to a destination in the continental United States. See Part I.A, infra
 
 
 [3]
 Section 222(e)(1) provides:
 In the case of any consolidation or merger of telegraph carriers pursuant to this section, the consolidated or merged carrier shall, except as provided in paragraph (2) of this subsection, distribute among the international telegraph carriers, telegraph traffic by wire or radio destined to points without the continental United States, and divide the charges for such traffic, in accordance with such just, reasonable, and equitable formula in the public interest as the interested carriers shall agree upon and the Commission shall approve: Provided, however, That in case the interested carriers should fail to agree upon a formula which the Commission approves as above provided, the Commission, after due notice and hearing, shall prescribe in its order approving and authorizing the proposed consolidation or merger a formula which it finds will be just, reasonable, equitable, and in the public interest, will be, so far as is consistent with the public interest, in accordance with the existing contractual rights of the carriers, and will effectuate the purposes of this subsection.
 47 U.S.C. § 222(e)(1) (1976).
 
 
 [4]
 As with telephone customers, telex subscribers "dial" the numbers of other customers they want to reach. After connection with the desired party is accomplished, the subscribers may exchange and copy information by means of terminals. TWX is functionally similar to the telex service, but differs in some technical characteristics. In addition, it is not available outside the United States and Canada. See Brief for Respondent at 4-5 and Brief for Petitioner WU at 4 n. * * *
 
 
 [5]
 These cities are New York, Washington, San Francisco, Miami, and New Orleans
 
 
 [6]
 WU entered into a separate contract with each IRC in the period between 1961 and 1967. See Western Union Telegraph Co., 68 F.C.C.2d at 99 n.5
 
 
 [7]
 For a brief discussion of the dispute preceding the granting of this discount, see Brief for Petitioner WU at 5-6
 
 
 [8]
 Western Union Telegraph Co., 68 F.C.C.2d at 100-101
 
 
 [9]
 Agreements were reached between WU and each of the IRCs as follows: WU-WUInt on June 12, 1975; WU-TRT on October 15, 1975; WU-RCA on December 31, 1975; WU-ITT on October 7, 1976. Western Union Telegraph Co., 68 F.C.C.2d at 101 n.10
 
 
 [10]
 Western Union Telegraph Co., 68 F.C.C.2d at 101. The full text of the agreements may be found in the Joint Appendix (J.A.) at 37-78
 
 
 [11]
 In addition to these claims, the IRCs presented two other major contentions: that WU failed to comply with § 61.38 of the Commission's Rules and Regulations, and that the tariffs would reduce, impair, or discontinue overseas service in violation of § 214 of the Act. Western Union Telegraph Co., 68 F.C.C.2d at 102. Petitioners have not raised these latter contentions on appeal
 
 
 [12]
 There is some disagreement as to which subsection of § 222(e) applies to the present case. In its decision the Commission relied upon § 222(e)(1) to support its ruling that WU's tariff was in clear conflict with the statute. WU argues here that § 222(e)(3) is the applicable provision. It contends that under this provision proposed changes need not be the subject of carrier agreement. The Commission now contends that § 222(e)(3) must be read to "continue() the requirements of subsection (1) in effect after merger ...." Brief for Respondent at 28-29
 
 
 [13]
 Section 201(a) states:
 It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
 47 U.S.C. § 201(a) (1976).
 
 
 [14]
 As this court most recently noted: "T(he) power to reject a tariff is limited; the tariff must be 'so patently a nullity as a matter of substantive law ... that administrative efficiency and justice are furthered by obviating any docket at the threshold ....' " American Broadcasting Cos., Inc. v. FCC, No. 79-1261 (D.C.Cir. Oct. 10, 1980), quoting Municipal Light Boards v. FPC, 450 F.2d 1341, 1346 (D.C.Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972)
 
 
 [15]
 Under the Federal Communications Act of 1934, carriers file new rates on their own initiative. The Commission may set the rates for investigation and hearing. In addition it may suspend their effectiveness for a period of up to five months; thereafter the rates become effective. The Commission may provide some protection for those subject to the increased rates by requiring the interested carrier to keep an account of the increases paid. If the Commission thereafter finds the new rates to be unlawful, it may then order a refund. 47 U.S.C. § 204(a) (1976)
 
 
 [16]
 Prior to the filing of these petitions, the parties filed petitions for reconsideration, which were denied by the Commission on October 12, 1978. Western Union Telegraph Co., 69 F.C.C.2d 924 (1978). In its review of these petitions for reconsideration, the Commission also considered the IRCs' petitions to reject or suspend contingent increases in the rates charged for inbound telex traffic filed by WU on June 30, 1978. WU had filed the rate increases in anticipation of higher costs for facilities furnished by AT&T. The Commission permitted the proposed increases to become effective, finding that WU intended to absorb much of the increased costs, which would reduce substantially its rate of return from the higher rates. Since the Commission's fear that WU would reap an excessive return from its proposed tariff was the primary reason for its suspension of WU's inbound rates, the Commission found no basis for suspension of the increase before it. Id. at 930, 933
 
 
 [17]
 Papago Tribal Utility Authority v. FERC, 628 F.2d 235 at 239 (D.C.Cir.1980), cert denied, 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (U.S. Sept. 22, 1980) (No. 80-465)
 
 
 [18]
 In Papago this court addressed the question of whether a decision by FERC to accept a rate filing by an electric power wholesaler is reviewable where the petitioner has alleged that the filing is patently defective. The petitioner had claimed that such defects as the wholesaler's improper calculation of its federal corporate income tax obligation and its erroneous amortization of certain expenses made the filing unlawful on its face; the Commission was therefore required to reject it summarily. The Commission acknowledged its obligation to reject filings which are substantive nullities or patently deficient in form but found the wholesaler's filing to be in substantial compliance with Commission rules. See Papago, at 234
 
 
 [19]
 The court in Papago found no such injury. It noted that if the Commission ultimately found the new rates to be unlawful, petitioner was entitled to a refund of its excess payments. Papago, 628 F.2d at 240
 
 
 [20]
 See text accompanying notes 14-16 supra
 
 
 [21]
 Section 201(b) states in relevant part:
 all charges, practices, classifications and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification that is unjust or unreasonable is declared to be unlawful.
 47 U.S.C. § 201(b) (1976).
 Section 202(a) states:
 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.
 47 U.S.C. § 202(a) (1976).
 
 
 [22]
 In its rejection of the parties' Joint Motion to Accept or Approve Agreements and Delete Issues, the Commission stated:
 We would like to rely on the parties' representations that they will amicably resolve their differences in the future and that we need not concern ourselves with their divisions disputes. However, as indicated in our May 1978 Order, their track record in this regard is characterized by "on-going conflicts," resulting in the withholding of payments by the IRCs in many cases and repeated actions before the courts and the Commission .... Under these circumstances, we believe the public interest would best be served by Commission prescription of lawful charges for IRC use of WU's domestic Telex/TWX networks.
 Western Union Telegraph Co., 71 F.C.C.2d at 629-30 (footnotes omitted).
 
 
 [23]
 See note 12 supra
 
 
 [24]
 In the usual situation a rejection of a filing is similar to the granting of a motion to dismiss on the face of a pleading. An agency may appropriately reject where the tariff submitted is "so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket." Municipal Light Boards v. FPC, 450 F.2d 1341, 1346 (D.C.Cir.1971), cert. denied, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 445 (1972). In such circumstances no further Commission action is required the issues are squarely presented for review. See, e. g., Press Wireless, Inc., 25 F.C.C. 1466 (1959), aff'd, 264 F.2d 372 (D.C.Cir.1959); Southern Pacific Communications Co., 67 F.C.C.2d 1569 (1978); MCI Telecommunications Corp., 60 F.C.C.2d 25, 45-47 (1976), rev'd, 561 F.2d 365 (D.C.Cir.1977). See also Bell System Tariff Offerings, 46 F.C.C.2d 413 (1974), aff'd, 503 F.2d 1250 (3d Cir. 1974)
 
 
 [25]
 The Commission argues that WU's petition is moot because the interim charges prescribed by the ALJ are equivalent to those charges sought by WU in its outbound tariff. WU contends, however, that it is entitled to restitution in the amount it would have received had the rates become effective on August 10, 1978, the same date its inbound rates became effective. In light of our disposition of WU's petition, we do not find it necessary to address this question at this time